Fuchsberg, J.
Where, as a sanction for his failure to comply with what was then our notice-of-alibi statute (CPL 250.20, formerly Code Crim Pro, § 295-1), the defendant was prevented from calling an alibi witness, is a subsequent holding that the statute is unconstitutional (People v Bush, 33 NY2d 921, cert den 419 US 848) retroactive so as to require, on direct appeal, that his conviction be reversed?
The Appellate Division having held that it does, that question is squarely presented for our determination here.
In addition, the Appellate Division found, as another ground for reversal, that the defendant’s due process rights had been violated by the admission of a police officer’s testimony of a station house viewing of the defendant about six hours after his arrest.
For the reasons which follow, we find that the unconstitutionality of the notice-of-alibi statute should be retroactively applied here. Therefore, on the ground that the alibi witness *265 testimony should not have been excluded, but on that ground alone, the judgment of conviction was properly reversed.
In the early afternoon of September 21, 1970, Detective Grant Webster, an undercover police officer, allegedly purchased 15 glassine envelopes containing heroin from the defendant Morales on a public street at East 123rd and Lexington Avenue in Manhattan. Webster did not make an immediate arrest. Rather, by running his hand through his hair, a prearranged signal, he informed his backup team consisting of three other officers who, from a parked car about a half block from the corner, had been observing him conversing with Morales, that he had completed a drug purchase.
The backup teams then drove, according to plan, to a nearby location where they rendezvoused with Detective Webster. There he vouchered his purchase in a police property envelope, which he sealed, signed and left with his fellow policemen. He also wrote a detailed description of Morales on the envelope, along with the date of the sale and the name "J.D. [for John Doe] Goatee”. The fictitious name was derived from the way in which Morales groomed his beard, his true name then being unknown to the officer. Webster also took note of the drug seller’s color, size and physical appearance and that he was smartly dressed, wearing a maroon leather jacket and a blue knit shirt with a white collar. The accuracy of these descriptive details was later to be admitted at trial.
After making his notes, Webster entered a truck, drove back to thé street where he had made the purchase and cruised the neighborhood until he saw Morales again. Thereupon, he radioed his backup team, directing them to arrest the man he had described and whom they had earlier seen. That evening, at the conclusion of his day’s work, which was about six hours after the arrest, Detective Webster, who, in accordance with the practice of undercover policeman to avoid exposing themselves unnecessarily, had not been present when the backup team made the actual arrest, went to the police precinct where Morales was being held and viewed the prisoner by means of a "two-way mirror” through which Webster could see without being seen.
Morales’ trial, following indictment for selling and possessing the narcotics, began on January 19, 1972. On the witness stand, Webster made an in-court identification of Morales, based upon their original meeting at the time of sale. He was also permitted to testify, over objection, to his station house *266 observation of the defendant. Two members of the backup team also identified Morales as the person they had seen communicating with Detective Webster at the time of the sale.
Morales’ defense was an alibi. Prior to trial, the prosecutor demanded, and the defense supplied, a list of his alibi witnesses. It contained four names. At trial, however, he only put one of the four on the stand. The name of a second alibi-witness whom he attempted to call was not on the list. The People objected to her being called, and the objection was sustained on the ground that her name and other required information had not been furnished in advance pursuant to CPL 250.20, which provided:
"Notice of Alibi. 1. At any time before trial, the people may serve * * * a demand that if a defendant intends to offer a trial defense that at the time of the commission of the crime charged, he was at some place or places other than the scene of the crime, and to call witnesses in support of such defense, he must * * * serve upon the people * * * a 'notice of alibi’, reciting (a) the place or places where the defendant claims to have been at the time in question, and (b) the names, the residential addresses, the places of employment and the addresses thereof of every such alibi witness upon whom he intends to rely.
"2. If at the trial the defendant calls such an alibi witness, without having served the demanded notice of alibi * * * the court may exclude any testimony of such witness relating to the alibi defense. The court may in its discretion receive such testimony, but before doing so, it must upon application of the people, grant an adjournment not in excess of three days.”
People v Bush (33 NY2d 921, 923, cert den 419 US 848, supra), in which we specifically found there was "no significant difference” between the predecessor of CPL 250.20 and the notice-of-alibi statute which had been held unconstitutional by the United States Supreme Court in Wardius v Oregon (412 US 470) on June 11, 1973,* was decided on *267 December 28, 1973.
In Wardius, as in the present case, an alibi witness had been precluded from testifying because of the defendant’s failure to comply with an Oregon requirement for disclosure of alibi witnesses. The Wardius court found the defendant there did not have to comply because no reciprocal obligation had been placed upon the prosecution to disclose whom it would call to rebut the testimony of defendant’s alibi witnesses, saying (p 476): "It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State.”
The court there then went on to applaud the modern trend of broad discovery in criminal causes, cautioning, however, that (p 475) "discovery must be a two-way street. The State may not insist that trials be run as a 'search for the truth’ so far as defense witnesses are concerned, while maintaining 'poker game’ secrecy for its own witnesses.”
In contrast, since the Bush defendant had complied with the statute and so had not been prevented from calling his alibi witnesses, our court there found that the lack of reciprocity of disclosure had merely "hindered” Bush’s preparation "to impeach, discredit or rebut” the prosecutor’s rebuttal proof. (Bush, supra, p 923.) We concluded that the effect of the rule in that case had not gone to the (p 923) "integrity of the fact-finding process”, but merely impinged on "procedural fairness” and, therefore, the Wardius holding should not be applied retroactively to benefit Bush, whose trial had started prior to the date of the Wardius decision. However, we did not reach the question of whether retroactivity would apply on direct appeal to a case where a defendant, as in Wardius, had not merely lacked the fight to obtain reciprocal information from the prosecution, but had been prevented from introducing his own alibi witnesses on direct. We specifically left "that determination to another day”. (Bush, supra, p 924.)
As already indicated, the Morales trial having started in January, 1972, its trial date antedates the Wardius decision. Further, like Wardius, it involved the actual exclusion of a witness and not just a lack of reciprocity. Finally, it is here on direct appeal. Thus, Morales having met all its conditions, the "another day” bespoken by Bush is now here.
The concept of "retroactivity” is not new. It has an ancient *268 tradition, under which Judges were not deemed to "make law” as such, but to "pronounce the law” which, even if it had previously been enunciated erroneously, was conceived of as having always been there, waiting just to be correctly stated. (Mishkin, The High Court, the Great Writ, and the Due Process of Time and Law, 79 Harv L Rev 56, 58.) Consequently, since the "correct” law was looked upon as having always been the same, a case decided on direct appeal always received the benefit, or detriment, of any decisional law "pronounced” before its judgment became final. (See United States v Schooner Peggy, 1 Cranch [5 US] 103, 110.) However, once a judgment had become final, it was not affected by law freshly "pronounced” thereafter. (1 Blackstone’s Commentaries 69 [15th ed]; 1 Black, Judgments [2d ed], §§ 245, 246.)
Building on that historic common-law doctrine, during the 1960’s the United States Supreme Court, especially in cases involving deprivations of constitutional due process rights under the Fourteenth Amendment in criminal cases, began to employ retroactivity in expanded and varied forms. In some cases, it enlarged upon the traditional application to permit collateral attack on judgments of conviction which had long been final. (E.g., Robinson v Neil, 409 US 505 [double jeopardy]; Ashe v Swenson, 397 US 436 [same]; Arsenault v Massachusetts, 393 US 5 [right to counsel at preliminary hearings]; McConnell v Rhay, 393 US 2 [right to counsel at sentencing]; Roberts v Russell, 392 US 293 [right of confrontation]; Berger v California, 393 US 314 [same]; Jackson v Denno, 378 US 368 [right to pretrial determination of voluntariness of confession].) In others, it adhered to the old rule of applicability only to judgments still pending on direct appeal. (Linkletter v Walker, 381 US 618 [evidence obtained in violation of Mapp v Ohio, 367 US 643]; Tehan v Shott, 382 US 406 [adverse comment on accused’s failure to testify].) In yet others, "retroactivity” took a prospective turn, reaching only to cases as yet untried (e.g., Daniel v Louisiana, 420 US 31 [exclusion of women from juries]; De Stefano v Woods, 392 US 631 [right to jury trial]; Johnson v New Jersey, 384 US 719 [police interrogation rules set forth in Escobedo v Illinois, 378 US 478 and Miranda v Arizona, 384 US 436]), or even only to cases where the commission of the crime involved was to take place after the newly-pronounced law was handed down. (E.g., Williams v United States, 401 US 646 [unlawful searches *269 incident to arrest]; Desist v United States, 394 US 244 [use of illegal wiretaps]; Stovall v Denno, 388 US 293 [right to counsel at lineup].)
These developments have not been without recognition in our State (see, generally, People v Buia, 34 NY2d 529; People v Bush, 33 NY2d 921, cert den 419 US 848, supra; People v Bennett, 30 NY2d 283, 288; People v Feinlowitz, 29 NY2d 176; People v Lo Cicero, 28 NY2d 525, cert den 402 US 997; People v Zabrocky, 26 NY2d 530; People v Reynolds, 25 NY2d 489; People ex rel. Cadogan v McMann, 24 NY2d 233; People v McQueen, 18 NY2d 337). Their impress is also to be found in our sister States’ cases, specifically including ones involving alibi disclosure statutes (e.g., Allison v State, 62 Wis 2d 14; Commonwealth v Contakos, 455 Pa 136; Commonwealth v Diana, 455 Pa 267; People v Cline, 19 Ill App 3d 446; cf. Rohl v State, 65 Wis 2d 683).
Analysis of the Federal and State cases does not, however, yield a set of definitive principles. "Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved”. (Johnson v New Jersey, 384 US 719, 728; see, also, Desist v United States, 394 US 244, 251.)
Nevertheless, some clues are discernible, a useful one being the very general guides set out in Desist v United States (supra, p 249) as follows: "The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.”
The present case appears to measure up to these criteria. The due process standard here sought to be applied retroactively "profoundly and directly” affected the fact-finding process itself. (Ivan v City of New York, 407 US 203; People v Bush, 33 NY2d 921, cert den 419 US 848, supra; People ex rel. Cadogan v McMann, 24 NY2d 233, supra.) A sine quo non of such a process is the making available of relevant and trustworthy evidence which the parties seek to adduce in support of their respective contentions. Therefore, when the ability to call witnesses is frustrated, we are not faced with a tactical or procedural inhibition of uncertain effect. The importance of this right is underwritten in the Sixth Amendment of the *270 United States Constitution, which through the Fourteenth Amendment is applicable to the States (Washington v Texas, 388 US 14). It is most relevant that the witness provisions of the Sixth Amendment are coupled with the one guaranteeing right to counsel; right to counsel decisions are among those which have most commonly been deemed retroactive. (E.g., Arsenault v Massachusetts, 393 US 5, supra; McConnell v Rhay, 393 US 2, supra.) And, returning to the case before us, the testimony of the excluded witness would have gone to the heart of the issue around which the trial revolved: Was Morales the person who sold the narcotics to Webster?
Furthermore, there appears to have been no significant degree of reliance on our notice-of-alibi statute by law enforcement authorities in general, or prosecutorial authorities in particular, so as to adversely affect the administration of justice through retroactive application of the Wardius rule. We are not dealing with the open-ended situation which occurs when there is collateral attack on a final judgment. The statute involved is now amended. Neither party has directed our attention to even a single other reported or pending case involving excluded alibi testimony under the old statute.
Indeed, reliance on the old statute would not be fatal to the prosecution of such cases. Though there would be an element of surprise if an undisclosed alibi witness were called, that would present no more unique or insurmountable an advocacy problem than that which confronts both the prosecution and defense as to most nonalibi witnesses. For instance, the witness in the case before us will still have to survive the scrutiny of cross-examination and the other tests of credibility that make up the trial decisional process, and the trial court, if it believes there is sufficient prejudice or surprise, may counteract it by ordering a continuance to provide opportunity for preparation "to impeach, discredit or rebut” the witness, thus preventing even "procedural unfairness”. (Cf. People v Bush, 33 NY2d 921, 923, cert den 419 US 848, supra.)
It follows that the requirement that the seriousness of the decision for which retroactivity is sought be balanced against the seriousness of its impact on the administration of justice is easily met in this case: the decision here is of serious constitutional dimension; the effect on the administration of justice by retroactive application is, at most, relatively inconsequential. *271 In short, retroactivity is supported by both sides of the equation.
Since there will be a new trial, we turn now to the station house viewing of Morales by Webster. Following an identification hearing held at defendant’s request, the trial court found that the viewing had not been for the purpose of identification but for Webster to assure himself that his backup team had arrested the man he intended. On the uncontradicted proof in this case, that conclusion was correct, and Webster’s testimony as to the viewing was proper.
The vice to be avoided by the salutary safeguards required to avoid suggested or mistaken identifications generally apply to initial identifications. The identifier often is either a victim of the crime or a witness to it who has experienced an unexpected or stress-laden criminal encounter, is without special training, and very possibly finds himself in an environment far from ideal for observation. Thus, his best view of the defendant may actually be on the occasion of the identification, a view that will tend to supplant the less secure recollection he had formed at the time of the crime. If induced by a nonobjective procedure, the result may be an irradicable faulty identification which becomes the witness’ standard of comparison for all subsequent views. (See Levine & Tapp, The Psychology of Criminal Identification: The Gap from Wade to Kirby, 121 U of Pa L Rev 1079, 1086 et seq.)
Here the circumstances were entirely different. Webster was not the ordinary witness to a crime. His participation was deliberate and planned. It was his job. He was trained and experienced for precisely such a role. His objective was the detection of criminal activity and the apprehension and conviction of the perpetrator. He could be expected to make careful observations of the appearance and activities of the suspect, focused all the more - by the consciousness of his future need to make a detailed in-court identification. A second viewing by him would not bear the burden of the caveats involved in one by a nonprofessional.
In fact, the station house viewing was not Webster’s second viewing at all. It was his third. For, upon returning to relocate the defendant before ordering his arrest, Webster had to scour the neighborhood, a method of identification which it would be difficult to match in assurance of accuracy, since it had to be made from a random sampling of people on a street in broad daylight in a congested neighborhood where, as the record *272 indicates, the choice would have to be made among many people of similar physical appearance.
Since he initially carefully observed Morales while engaged in the face-to-face sales transaction with him, and shortly thereafter looked for and found him for the purpose of arranging for the arrest, by the time of the station house viewing by Webster, identification was behind him. That viewing later the very same day was, far from being improper, actually "consistent with good police work” (United States ex rel. Cummings v Zelker, 455 F2d 714, 716, cert den 406 US 927 [prompt on the scene confrontation]; see People v Logan, 25 NY2d 184, 194, cert den 396 US 1020) since it assured that an innocent man was not incarcerated by someone else’s mistake. Indeed, such police conduct comports with the strong "desirability of expeditious release of innocent suspects” (Russell v United States, 408 F2d 1280, 1284, cert den 395 US 928) and, is therefore, not objectionable. Also, the procedure was not "unnecessarily suggestive” (see People v Logan, 25 NY2d 184, cert den 396 US 1020, supra) and counsel was not required, since adversary proceedings had not been initiated (People v Blake, 35 NY2d 331).
Nor did Detective Webster’s testimony constitute improper bolstering. Only so-called third-party bolstering is impermissible as prejudicial hearsay (see Sobel, Assailing the Impermissible Suggestion: Evolving Limitations on the Abuse of Pre-Trial Criminal Identification Methods, 38 Brooklyn L Rev 261, 284-286). Even then, pursuant to statute (CPL 60.25), a witness to an identification by another is permitted to give evidence in chief as to the original identification where the "identifying witness is unable to make an identification at trial.” (People v Lagana, 36 NY2d 71, 74; see People v Nival, 33 NY2d 391, cert den 417 US 903; Sobel, 38 Brooklyn L Rev 261, 286.)
At trial, Detective Webster identified Morales without regard to his later viewing of him at the station house. That did, of course, have a tendency to "bolster” the testimony of the other oificers who described their observation of Morales selling drugs to the detective, but no more so than the testimony of every eyewitness to a crime may strengthen that of others who testify to the same effect. As to the testimony of his station house viewing, just as Webster, if he had witnessed the arrest, would have been permitted to testify that the man arrested was the one who sold him the drugs, so his testimony *273 that the man who had been arrested was the seller was equally admissable.
The Appellate Division, in reversing, has ordered a new trial. In accordance with this opinion, that order should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur.
Order affirmed.

 The Legislature responded to this decision by enacting a statute containing some reciprocal discovery (L 1974, ch 420, § 1). Wardius, while outlawing the exclusion of witnesses in the absence of reciprocity, had not gone so far as to indicate under what kind of reciprocal statute, if any, exclusion would be permissible. At least one commentator believes that the amended New York statute does not provide sufficient reciprocal discovery to satisfy the Wardius criteria (Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11A, CPL 250.20, Pocket Part [1974-1975], pp 107-108). This case does not present the opportunity to rule on the question, and we express no opinion on it at this time.