THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN WHITAKER, Appellant.

Second Department, June 9, 1980

### APPEARANCES OF COUNSEL

*Barry Gene Rhodes* for appellant.

*Eugene Gold, District Attorney (Peter Weinstein* of counsel), for respondent.

### OPINION OF THE COURT

TITONE, J.

In *People v Rogers* (48 NY2d 167 [decided Oct. 23, 1979]), the Court of Appeals held that once an attorney has entered a criminal proceeding, thereby signifying that the police should cease questioning, a defendant may not be further interrogated in the absence of counsel even when the interrogation concerns matters unrelated to the charge for which he is already represented by counsel. The principal question presented on appeal is whether the rule enunciated in *Rogers* should be applied retroactively or only prospectively. Appellant's judgment of conviction for the crimes of murder in the second degree, three counts of robbery in the first degree, and criminal possession of a weapon in the second degree, was rendered on February 28, 1977, after a jury verdict, or almost 32 months prior to the Court of Appeals determination in *People v Rogers (supra).* I conclude that the determination of the Court of Appeals in *Rogers* applies even though the trial and judgment of conviction of appellant antedate such deter-

mination. Accordingly, the judgment must be reversed and the case remitted for a new trial.

In the early evening of January 4, 1976, Charles Hill, a correction officer and part owner of the Moulin Rouge Bar in Brooklyn, was seated near the middle of the bar. At about 6:05 P.M. three strangers entered the establishment. One of them, a man dressed in a three-quarter length dark leather jacket, struck up a conversation with Hill. Approximately 15 to 25 minutes later, a shot rang out. The patrons, all turning toward the sound, saw Hill appear to rise from his barstool, gasp, fall first into the arms of the stranger in the dark leather jacket, and then fall to the floor dead. They also noticed that the stranger had a gun in his hands. The three intruders proceeded to hold the other occupants of the bar at gunpoint and take money from the cash register, and money and personal property from the patrons. Shortly thereafter the three escaped in the Cadillac of one of the patrons.

Early in the investigation of the murder of Hill and the robbery at the bar, a police officer received confidential information that one Lindsay Webb had fired the fatal shot at Hill. Webb was arrested on the morning of January 24, 1976 and brought to the police precinct. It was then decided by Detective Anthony Martin to hold a lineup in which Webb would be included. Three of the eyewitnesses to the shooting, Shiloh, Cooke, and Dukes, would be asked at the lineup if they could identify the person who killed Hill.

However, Martin encountered some difficulty in finding police officers who resembled Webb to participate in the lineup. As a result he arranged with two other detectives to use two prisoners they had in custody as stand-ins at the lineup. One of the prisoners was appellant, John Whitaker, who had been arrested for the murder of one Harriet Gathers.

Dukes, Shiloh and Cooke viewed the lineup. The first two could make no identification. However, Cooke, to the surprise of the police officers present, identified Whitaker, not Webb, as the one who shot Hill. Then Shiloh, without speaking to Cooke, asked to view the lineup again. He was permitted to do so. On the second viewing Shiloh also selected appellant as the one who committed the homicide. At the trial both Cooke and Shiloh again identified appellant as the perpetrator.

Between January 24, 1976, the date the lineup was held, and February 24, 1976, appellant, under arrest for the Gathers homicide, made two telephone calls to Detective Clarence

Crabb, his arresting officer. Each time appellant urgently asked Crabb to see him. Appellant expressed annoyance that Crabb had helped "put my tail in the soup" by extracting a statement from him relating to the Gathers homicide.

On February 24, Crabb responded to appellant's request to speak to him by meeting him in the ninth floor pens in the criminal court building during luncheon recess. Crabb refused to discuss the Gathers case with appellant ostensibly because the latter was represented by counsel and already under indictment in that case. However, Crabb described the events of the Hill homicide, advised appellant of his rights, and asked him if he wished to discuss it. Appellant confessed to having killed Hill notwithstanding that Crabb warned him six times that he was making no promises in return for the confession. After the *Huntley* hearing was concluded, the court found that appellant was not represented by an attorney in connection with the instant case when he made the confession and that it was voluntarily given. Accordingly, the trial court denied appellant's motion to suppress it. After the trial the jury found appellant guilty of murder in the second degree, three counts of robbery in the first degree and criminal possession of a weapon in the second degree.

From the factual recitation above, it is manifest that the eliciting of a confession by Detective Crabb from appellant at a time when he was represented by counsel in an unrelated criminal case, is encompassed within the four corners of the rule enunciated in *Rogers* (48 NY2d 167, *supra*) proscribing such mode of police action. Speaking for the majority in *Rogers,* Chief Judge Cooke clearly, unequivocally and succinctly held (p 173): "Our acknowledgment of an accused's right to the presence of counsel, *even when the interrogation concerns unrelated matters,* represents no great quantitative change in the protection we have extended to the individual as a shield against the awesome and sometimes coercive force of the State. An attorney is charged with protecting the rights of his client and *it would be to ignore reality to deny the role of counsel when the particular episode of questioning does not concern the pending charge* * * * Once a defendant has an attorney as advocate of his rights, the attorney's function cannot be negated by the simple expedient of questioning in his absence." (Emphasis supplied.)

Having determined that the police interrogation in *Rogers (supra)* was improper, the Chief Judge then turned to the

question of whether defendant's inculpatory statement was admissible as a spontaneously volunteered statement within the purview of *People v Hobson* (39 NY2d 479, 483). In the opinion of the Chief Judge (p 174), in order for an accused's statement "[t]o fit within this narrow exception, the 'spontaneity has to be genuine and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed' ", citing *People v Maerling* (46 NY2d 289, 302-303).

In the instant case Detective Crabb knew and for that matter told appellant, that he could not speak to the latter regarding the Gathers case for which appellant was already under indictment and represented by counsel. He could have either told appellant as much over the telephone or simply refrained from making any response to appellant's requests to visit him. Instead, Crabb visited appellant in his cell and once there used the Gathers case as a pretext to encourage appellant to discuss the Hill homicide with him face to face. I consider it significant that neither Crabb nor appellant ever mentioned the Hill homicide during their two telephone conversations which led up to their meeting in one of the pens located in the courthouse, and that Crabb admittedly obtained specific approval from his superior officers and an Assistant District Attorney to speak to appellant about the Hill homicide at any ensuing meeting. Accordingly, under both the circumstances and the aegis of the *Rogers* case (48 NY2d 167, *supra),* the police interrogation herein was clearly improper and the confession stemming therefrom was not admissible in evidence as a "spontaneously volunteered statement."

Before delving into the labyrinth of appellate court determinations pertaining to retroactive or prospective application of decisions in landmark criminal cases involving the constitutional rights of the accused to counsel, I believe it is essential that I briefly discuss the Court of Appeals pronouncements culminating in *Rogers (supra),* with respect to the questioning of an accused in custody in the absence of his attorney.

In *People v Arthur* (22 NY2d 325, 329) the Court of Appeals, in reversing defendant's conviction for attempted murder in the second degree and ordering a new trial, enunciated the broad rule that "[o]nce an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel".

However, such seemingly broad mandate was narrowed in scope by the same court in *People v Taylor* (27 NY2d 327). In *Taylor,* defendants were represented by assigned counsel for a robbery for which they were being held in custody. During their incarceration, law enforcement officers, after advising defendants of their rights under *Miranda,* questioned them about another crime (murder) and succeeded in obtaining inculpatory statements from them, all in the absence of their attorneys.

In upholding the First Department's denial of their motion to suppress the inculpatory statements, the Court of Appeals held, *inter alia,* that (1) inasmuch as no criminal proceeding had been commenced against defendants for the crime of murder at the time of questioning, their inculpatory statements were not inadmissible, and (2) it was of no consequence that the law enforcement officials knew that attorneys had been assigned at the arraignment on the robbery charge since the attorneys were in no way connected with the instant proceeding (see, also, *People v Hetherington,* 27 NY2d 242).

The exception as to unrelated charges articulated in *Taylor (supra)* was accorded due recognition by the Court of Appeals in dictum as late as May 4, 1976 in *People v Hobson* (39 NY2d 479, 483, *supra).* However, as conceded by Chief Judge Cooke in *Rogers* (48 NY2d 167, 171, *supra),* since *Hobson* it has been difficult "to define the precise reach of the limitation concerning unrelated charges." For instance, in *People v Ramos* (40 NY2d 610, 616), a majority of the members of this State's highest court held that the exception entitling the prosecution to question an accused in custody about an unrelated charge in the absence of counsel, did not bestow upon the prosecution the right to "ignore an affirmative act or statement on the part of an attorney, communicated in open court to the prosecution, indicating that the attorney has undertaken to represent the accused with respect to the second, unrelated crime."

In similar vein our highest State tribunal in *People v Carl* (46 NY2d 806, 807-808) held that the fact that police officers questioned defendant without counsel being present about a crime other than the one for which he was being held and had been assigned counsel, was a technicality of little significance since both incidents involved burglaries or attempted burglaries at the same location, they occurred a little more than a week apart, the Grand Jury considered both charges together,

and indicted the defendant for both incidents under the same indictment. Under such circumstances the charges were deemed to be sufficiently related.

In *People v Ermo* (47 NY2d 863), decided on June 12, 1979, just four months before it decided the *Rogers* case *(supra),* the Court of Appeals, in upholding by a 5 to 1 vote this court's suppression of defendant's statements, held that the police had exploited concededly impermissible questioning as to an assault charge for which defendant was represented by the Public Defender for the purpose of advancing their interrogation and eliciting inculpatory statements from defendant with respect to a homicide for which he was neither charged nor represented by counsel.

Finally, the Court of Appeals candidly acknowledged in *Rogers (supra)* that the strictures it had imposed in the *Taylor* case (27 NY2d 327, *supra)* upon the expansive language employed in *Arthur* (22 NY2d 325, *supra)* had proved to be troublesome in application and had been eroded and refined by the subsequent determinations in the *Ramos, Carl* and *Ermo* cases *(supra).* As a result, *Taylor (supra)* and the limitations therein were rendered nugatory and the rule enunciated in *Arthur (supra)* should stand undiminished. Thus, by holding in *Rogers* (48 NY2d 167, *supra)* that the *Taylor* limitations are not viable, and a fortiori an accused's right to the presence of counsel even when the interrogation concerns matters unrelated to the charge in which he is already so represented, the Court of Appeals, in the 11 years and 4 months period, commencing with *Arthur (supra)* and culminating with *Rogers (supra),* has traveled full circle.

Returning to the retroactive versus prospective issue pertaining to cases involving deprivations of constitutional due process rights under the Fourteenth Amendment, it should be noted that appellate courts both on the Federal and State level have found resolution of such questions to be at least as troublesome and perplexing as did the Court of Appeals in its efforts over the years "to define the precise reach of the limitation [enunciated in *Taylor]* concerning unrelated charges" *(People v Rogers, supra,* p 171). Indeed the majority of the members of the United States Supreme Court in *Linkletter v Walker* (381 US 618, 620), referred to "retrospectivity" as a question that "has become a most troublesome question in the administration of justice." It should be added at this point that despite the fact retroactivity has been discussed

and passed upon in numerous Supreme Court cases since *Linkletter (supra),* the question remains troublesome and perplexing.

In his opinion in *People v Morales* (37 NY2d 262, 267-269), Judge FUCHSBERG concisely and thoroughly discussed the concept of "retroactivity" and the avenues and detours it has traversed in the constitutional due process area. He stated that under common law a case decided on direct appeal always received the benefit, or detriment, of any decisional law pronounced before its judgment became final. However, once a judgment became final, it was not affected by law freshly pronounced thereafter.

Judge FUCHSBERG then observed that building on such historic common-law doctrine, especially in cases involving deprivations of constitutional due process rights under the Fourteenth Amendment in criminal cases, the United States Supreme Court in the 1960's employed retroactivity in expanded and varied forms. For instance it enlarged upon the traditional application to permit attack on judgments of conviction which had long been final, such as in the areas of double jeopardy *(Ashe v Swenson,* 397 US 436), right to counsel *(McConnell v Rhay,* 393 US 2; *Arsenault v Massachusetts,* 393 US 5), and right to pretrial determination of voluntariness of confessions *(Jackson v Denno,* 378 US 368). In other situations the Supreme Court adhered to the old rule of applicability only to judgments still pending on direct appeal, such as where evidence was obtained in violation of *Mapp v Ohio* (367 US 643) *(Linkletter v Walker,* 381 US 618, *supra),* and where adverse comment was made on accused's failure to testify *(Tehan v Shott,* 382 US 406).

Judge FUCHSBERG noted *(People v Morales, supra,* p 268) that by contrast, in still other cases " 'retroactivity' took a prospective turn," reaching in some instances only (a) to cases as yet untried, such as exclusion of women from juries *(Daniel v Louisiana,* 420 US 31), right to jury trial *(De Stefano v Woods,* 392 US 631), and police interrogation rules set forth in *Escobedo v Illinois* (378 US 478) and *Miranda v Arizona* (384 US 436); or (b) to cases where the commission of the crime involved was to take place after the newly pronounced law was handed down, for example, in unlawful searches incident to arrest *(Williams v United States,* 401 US 646), use of illegal wiretaps *(Desist v United States,* 394 US 244), and right to counsel at a lineup *(Stovall v Denno,* 388 US 293).

What is evident after reading the above cases involving retroactivity claims which the United States Supreme Court has passed upon, is the seeming lack of any solid foundation upon which a set of rules can be structured with any degree of permanence. As Judge FUCHSBERG cogently stated in *Morales* *(supra,* p 269): "Analysis of the Federal and State cases [in the retroactive area] does not * * * yield a set of definitive principles. 'Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved'."

Moreover, a comparative analysis of the Federal cases reveals not only an absence of "definitive principles" in this area, but also a lack of compatability. For example, right to counsel decisions are among those which the Supreme Court has held to be most commonly deemed retroactive *(Arsenault v Massachusetts, supra; McConnell v Rhay, supra),* as have decisions with respect to the use of a coerced confession at trial (cf. *Tehan v Shott, supra,* pp 413-416). However, the same court has also held that the police interrogation rules set forth in *Escobedo* and *Miranda (supra),* apply only to cases yet untried *(Johnson v New Jersey,* 384 US 719), despite the fact that permeating both *Miranda* and *Escobedo (supra),* especially *Escobedo,* are strong and explicit expressions supporting the fundamental and constitutional rights of an accused to consult with, and be effectively represented by, counsel; and also to be free from coercive or deceptive police actions designed to extract or elicit a confession or an incriminating statement. For example the following germane statements are found in *Escobedo* (378 US 478, 484-492, *supra):*

"In *Massiah v. United States,* 377 U.S. 201, this Court observed that 'a *Constitution which guarantees a defendant the aid of counsel at . . . trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. Anything less . . . might deny a defendant "effective representation by counsel at the only stage when legal aid and advice would help him."'* * * *

"The interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference. When petitioner requested, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of 'an

unsolved crime' * * * Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so * * *

"It is argued that if the right to counsel is afforded prior to indictment, the number of confessions obtained by the police will diminish significantly, because most confessions are obtained during the period between arrest and indictment, and 'any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances.' * * * *This argument, of course, cuts two ways. The fact that many confessions are obtained during this period points up its critical nature as a 'stage when legal aid and advice' are surely needed * * * The right to counsel would indeed be hollow if it began at a period when few confessions were obtained. There is necessarily a direct relationship between the importance of a stage to the police in their quest for a confession and the criticalness of that stage to the accused in his need for legal advice. Our Constitution, unlike some others, strikes the balance in favor of the right of the accused to be advised by his lawyer of his privilege against self-incrimination.* * * *

*"We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."* (Emphasis supplied.)

Likewise, *Miranda* contains the following very pertinent remarks (384 US 436, 461, 469, 471-472, *supra):*

"As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.

"This question, in fact, could have been taken as settled in federal courts almost 70 years ago, when, in *Bram v. United States,* 168 U. S. 532, 542 (1897), this Court held: 'In criminal trials, in the courts of the United States, *wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person "shall be compelled in any criminal case to be a witness against himself." '* * * *

"The circumstances surrounding in-custody interrogation

can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection *of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process.* * * *

"In *Carnley v. Cochran,* 369 U. S. 506, 513 (1962), we stated: *'[I]t is settled that where the assistance of counsel is a constitutional requisite,* the right to be furnished counsel does not depend on a request.' *This proposition applies with equal force in the context of providing counsel to protect an accused's Fifth Amendment privilege in the face of interrogation.* * * *

"The privilege against self-incrimination secured by the Constitution applies to all individuals. *The need for counsel in order to protect the privilege* exists for the indigent as well as the affluent." (Emphasis supplied.)

Notwithstanding its strong utterances in *Escobedo* (378 US 478, *supra)* and *Miranda (supra),* the United States Supreme Court in *Johnson v New Jersey* (384 US 719, 729-730, *supra)* based its determination of prospectivity with respect to its pronouncements in *Miranda* and *Escobedo* on the premise that the prime purpose of the rulings in both cases was "to guarantee full effectuation of the privilege against self-incrimination, the mainstay of our adversary system of criminal justice", and that they do not "encompass situations in which the danger is not necessarily as great as when the accused is subjected to overt and obvious coercion." The Supreme Court in *Johnson (supra)* cited with approval its determination in *Tehan v Shott* (382 US 406, 415-416, *supra)* wherein it stated:

"[T]he basic purposes that lie behind the privilege against self-incrimination do not relate to protecting the innocent from conviction, but rather to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution 'shoulder the entire load.' * * *

"The basic purpose of a trial is the determination of truth, and it is self-evident that to deny a lawyer's help through the technical intricacies of a criminal trial * * * because the accused is poor is to impede that purpose and to infect a criminal proceeding with the clear danger of convicting the innocent * * * The same can surely be said of the wrongful use of a coerced confession * * * *By contrast,* the Fifth

Amendment's privilege against self-incrimination is not an adjunct to the ascertainment of truth. That privilege, like the guarantees of the Fourth Amendment, stands as a protection of quite different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone. To recognize this is no more than to accord those values undiluted respect." (Emphasis supplied.)

Thus the Supreme Court in *Johnson (supra)*, consistent with its dictum in *Tehan (supra)*, first examined, in isolation, the purposes of the Fifth Amendment privilege against compulsory self incrimination, and then opted for a prospective application of the rules set forth in *Escobedo (supra)* and *Miranda* (384 US 436, *supra)* instead of a retroactive one. What it did not do either in *Johnson* or *Tehan* was to recognize, as it did in *Miranda* and *Escobedo,* the close interrelationship of an accused's Fifth and Sixth Amendment rights in situations stemming from police interrogation of an accused in the absence of counsel.

In my opinion, it is extremely difficult (and perhaps impossible) to reconcile the thrust of the caveat in *Escobedo (supra,* at p 492), "when the process [police interrogation] shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—*our adversary system begins to operate, and, under the circumstances here,* the *accused must be permitted to consult with his lawyer",* when read *in pari materia* with the pronouncement in *Arsenault v Massachusetts* (393 US 5, 6, *supra)* that the right to counsel at all other " *'critical' stages of the criminal proceedings * * * have all been made retroactive, since the 'denial of the right must almost invariably deny a fair trial' "* (emphasis supplied), with the contrasting and limiting statements in *Johnson v New Jersey* (384 US 719, 729-730, *supra)* that the rulings in *Miranda (supra)* and *Escobedo* (378 US 478, *supra)* should be administered prospectively because the purposes of such rulings were simply "to guarantee full effectuation of the privilege against self-incrimination," and merely to "guard against the possibility of unreliable statements in every instance of in-custody interrogation".

With respect to this case it may logically be argued that even under the prospective theory enunciated in *Johnson v New Jersey (supra)*, appellant may come within the ambit of, and benefit from, the rules set forth in *Escobedo (supra)* and *Miranda (supra)* concerning the right of an accused to have

his attorney present during an in-custody police interrogation, since appellant's trial and ensuing conviction occurred many years after the Supreme Court decisions in those two cases. Although *Rogers* (48 NY2d 167, *supra)* was decided by the Court of Appeals after appellant's trial, the decision therein may very well be construed as one which simply and collaterally delineates the breadth and scope of the basic tenets enunciated in *Escobedo (supra)* and *Miranda (supra),* but in no way alters or narrows such tenets or proscribes their application in cases tried before the *Rogers* decision but still pending on appeal. Indeed, support for such construction may be drawn inferentially from the following sentence found in Chief Judge Cooke's opinion in *Rogers* (48 NY2d, at p 173): *"Our acknowledgment of an accused's right to the presence of counsel, even when the interrogation concerns unrelated matters, represents no great quantitative change in the protection we have extended to the individual as a shield against the awesome and sometimes coercive force of the State."* (Emphasis supplied.)

However, assuming the decision in *Rogers (supra)* is pivotal to the issue herein, I then conclude that *Rogers* should be applied (retroactively) to a case (such as this one) which was pending on appeal at the time the decision in *Rogers* was rendered. Implicit in *Rogers (supra)* is the conclusion that unless an accused has interposed a valid waiver, he is deemed to have been denied effective representation of counsel at a crucial stage of a criminal proceeding in a situation where, although represented by an attorney, he is subjected to an in-custody police interrogation without the attorney being present; and that it is immaterial whether or not the interrogation is related to the charge on which the attorney has been retained or assigned. "There can be no doubt that the right to assistance of counsel is an essential ingredient in our system of criminal jurisprudence, rooted deeply in our concept of a fair trial within the adversarial context. It is 'one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty' " *(People v Felder,* 47 NY2d 287, 295-296). The Court of Appeals "has jealously guarded the individual's privilege against self incrimination and right to counsel, demanding that these fundamental rights be accorded the highest degree of respect by those representing the State" *(People v Rogers, supra,* p 170). Right to counsel decisions are among those which have most

commonly been deemed retroactive *(People v Morales,* 37 NY2d 262, 270, *supra).* The constitutional right to the assistance of counsel applies *with equal force* in the context of providing counsel to protect an accused's Fifth Amendment privilege in the face of interrogation (cf. *Carnley v Cochran,* 369 US 506, 513). The right to counsel at trial, on appeal and at other critical stages of criminal proceedings have all been made retroactive since the denial of the right must almost *invariably deny a fair trial* (cf. *Arsenault v Massachusetts,* 393 US 5, 6, *supra).* The right to counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial *(People v Felder, supra,* p 296).*

In my opinion a limited retroactive application of *Rogers,* (48 NY2d 167, *supra),* i.e., the governing by it of other cases still pending as well as the parties to *Rogers* itself (cf. Ann. 10 ALR3d 1371, 1401-1403; *Jackson v Denno,* 378 US 368, *supra; People v Moll,* 22 AD2d 921), would not place an undue burden on the administration of justice. To date there appears to be no significant degree of reliance by law enforcement authorities in pending appeals on the pre-*Rogers* limitation enunciated in *People v Taylor* (27 NY2d 327, *supra).* This court is not dealing with the open-ended situation which occurs when there is a collateral attack on a final judgment *(People v Morales, supra,* p 270; cf. *Desist v United States,* 394 US 244, 251, *supra).*

Moreover, the purpose served by *Rogers (supra)* is not so much as to quantify *in futuro* the protection extended to individuals against self incrimination but rather to reaffirm and clarify the fundamental right of an accused to be represented by counsel during an in-custody interrogation (cf. *Desist v United States, supra).* Furthermore, since in effect it was also held in *Rogers (supra)* that under the circumstances, defendant's inculpatory statement was not "spontaneously volunteered" but rather induced by the psychological coercive influence of police tactics, a challenge to an involuntary statement made under similar circumstances should be upheld

---

* In a recent decision, the Third Department also applied the rule in *Rogers* retroactively *(People v Albro,* 73 AD2d 73). Speaking for the entire Bench in *Albro,* although one Justice dissented on another issue, Presiding Justice MAHONEY stated, *inter alia* (pp 75-76): "We believe the *Rogers* rule *(supra)* should be given retroactive effect. The rule was fashioned to guard an individual's privilege against self incrimination and right to counsel. '[R]ight to counsel decisions are among those which have most commonly been deemed retroactive' *(People v Morales, supra,* p 270)."

in a case where the appeal from a conviction after trial was pending at the time *Rogers* was decided (cf. *Jackson v Denno,* 378 US 368, *supra; Gerberding v Tahash,* 387 US 91, revg 275 Minn 195).

■ With respect to appellant's claim that the identification of him at the lineup as the person who fatally shot Hill should be suppressed because he was compelled to participate in such proceeding, it should be noted that unlike the situation in *People v Vega* (51 AD2d 33), appellant was not a suspect at the time but was being used merely to "flesh out" the proceeding. Moreover, there is no evidence in the record to support a conclusion that the identification proceeding was not fairly conducted or that the identification of appellant as the perpetrator was suggestively induced. In fact, the purpose of using appellant, a nonsuspect, in the lineup, was to insure that the procedure would be as fair as possible (cf. *Peopel v Blake,* 35 NY2d 331; see, also, Wall, Eye-Witness Identification in Criminal Cases, pp 57-58). I am also of the opinion that assuming the identification of appellant at the lineup should be suppressed because he was compelled to participate in it, the in-court identification of appellant had a sufficient independent origin.

Accordingly, the judgment of the trial court should be reversed, the confession suppressed, and the case remitted to the Supreme Court, Kings County, for a new trial.

HOPKINS, J. P., DAMIANI and MANGANO, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered February 28, 1977, reversed, on the law, defendant's confession is suppressed, and new trial ordered.