FIRST DEPARTMENT, JULY, 1988

(July 7, 1988)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EUGENE CONNELL LORICK, Appellant.—Judgment of the Supreme Court, New York County (Albert P. Williams, J.), rendered on September 25, 1986, convicting defendant, following a jury trial, of robbery in the first and second degrees and sentencing him, as a second felony offender, to concurrent indeterminate terms of imprisonment of from 4½ to 9 years and 3 to 6 years, respectively, is reversed on the law and the matter remanded for a hearing to determine if there was an independent source for the complainant's identification of defendant and for a retrial.

The People properly concede that reversal of defendant's conviction is mandated as a result of the trial court's action in providing the jury, over defendant's objections, with written copies of the statutory law applicable to the case in order to assist them in considering the elements of the offenses in question *(People v Owens,* 69 NY2d 585). However, there is a dispute involving the admissibility of identification testimony derived from the station house showup which occurred herein. In that regard, in the companion cases of *People v Riley* and *People v Rodriguez* (70 NY2d 523, 531), the Court of Appeals declared that: "precinct showup procedures should have almost no place in acceptable identification procedures, unless exigency warrants them. The People must bear the heavy burden of overcoming the inevitable suggestibility of the combined setting and showup. Avoiding the threshold locational impediment does not end the prosecutor's burden, however, because apart from showing the emergent need to conduct a showup in a precinct at all, the prosecution must also address the inextricably implicated companion problem—the inherent unreliability of a showup itself. They must therefore

501

also demonstrate to a court what steps were taken to insure that the identifications in the particular case were free of both the basic unreliable suggestiveness and of exacerbating exploitation."

In the instant situation, the People made no effort to establish the existence of exigent circumstances, and an examination of the hearing minutes reveals that there was no such exigency. According to Officer Timothy Norris of the Port Authority Police Department, following the removal of the suspects to the station house, he inventoried their property and, thereafter, conducted an interview with the complaining witness for some 30 to 45 minutes. Then he discussed with his follow officers the subject of holding a showup. All of this took place prior to the showup actually being arranged. Thus, not only were the perpetrators in custody as a consequence of the complainant's earlier street identification, and they were in no danger of absconding, but the police conduct itself belied any indication of exigency. Clearly, the officers were in no hurry to obtain a second identification since, before the showup was finally undertaken, they took their time to question the complainant at length and to carry out routine police procedures. There was, therefore, no justification whatever for the failure to establish a lineup, nor was there any evidence that a lineup identification would have been unduly burdensome.

The dissent does not urge that exigent circumstances supported the station house showup. Rather, it appears to discern a limitation to the Court of Appeals sweeping statement that "precinct showup procedures should have almost no place in acceptable identification procedures, unless exigency warrants them" (People v Riley, supra, at 531) to instances where no prior identification of the suspect(s) has ever been made. It is difficult to perceive how the dissent can attempt to restrict the reach of People v Riley, (supra) to the facts of this case. The fact is that, contrary to the dissent's characterization of the precinct identification as merely "confirmatory", the street identification herein could hardly be deemed reliable. In this regard, the dissent misperceives what actually occurred insofar as it refers to the precinct showup as confirming a reliable street identification. The complainant observed the suspects from a distance of some 15 to 20 feet while they were facing a wall with their hands up. Indeed, the complainant was subsequently unable to identify 1 of the 2 suspects at the station house, and it is evident that the officers themselves were not convinced of the reliability of the street identification. That is why, no doubt, they wanted to procure a second identification

of the suspects. However, instead of arranging for a trustworthy identification by conducting a lineup, which they clearly had ample time and opportunity to do, the police compounded the problem by following one questionable identification with another. To conclude, as the dissent does, that the showup was no more than "confirmatory" and, thus, not unduly suggestive, is simply violative of the spirit and language of *People v Riley (supra)*.

While any testimony derived from the showup identification should have been suppressed, the trial court was certainly not precluded from finding an independent basis for the complainant's identification of defendant *(see, People v Riley, supra,* at 531), and a hearing with respect to this issue is required prior to defendant's retrial. Concur—Murphy, P. J., Milonas and Smith, JJ. Sandler, J., concurs, and Asch, J., dissents in part, each in separate memoranda as follows:

Sandler, J. (concurring).

The issue principally litigated on this appeal is whether the rule set forth in *People v Riley* (70 NY2d 523), striking down as unconstitutional station house showup identifications except in exigent circumstances, applies where a witness to the crime has identified someone as the responsible person on the street shortly after the crime under circumstances making that identification constitutionally admissible, and is thereafter asked to view the arrested person again at the station house in an effort to make sure that the witness had not erred in the original identification.

However, a study of the hearing minutes leaves me with a disturbing sense of uncertainty as to whether the witness had actually seen the features of those whom he had preliminarily identified. In fact, the Assistant District Attorney at the hearing expressed the view that the witness had not seen the features of 1 of the 2 persons whom he identified without, however, specifying which one the assistant believed that the witness had not actually seen. Accordingly, I am in agreement with the court that the facts set forth in the hearing minutes do not provide a basis for deciding this case on the basis of the issue primarily argued, or for distinguishing it from *Riley (supra)*. Because of the importance of the issue, and because the court's memorandum opinion, although ultimately resting on the uncertainty surrounding the street identification, may be construed as setting forth a more inclusive principle, I think it appropriate to discuss the issue that was presented by the parties on this appeal.

On analysis, it is a variation of the question addressed by

the Court of Appeals in *People v Morales* (37 NY2d 262) with regard to confirmatory showup identifications by undercover police officers. The *Morales* analysis opened with the following sentence *(supra,* at 271): "The vice to be avoided by the salutary safeguards required to avoid suggested or mistaken identifications generally apply to initial identifications." The opinion went on at length to detail the differences between identifications by civilian witnesses, usually the victims of crimes occurring quickly under exciting circumstances, and identifications by trained professional police officers who, as in the case of an undercover officer, observed the crime under circumstances in which it was part of the officer's professional duty to observe closely the features of the person with whom he was involved.

I agree that this latter part of the analysis was decisive in *People v Morales (supra)*. But this does not in any way diminish the importance to the issue argued here of the absolutely accurate statement in that analysis by the Court of Appeals that the vice to be avoided by the safeguards (i.e., lineup identifications) "generally apply to initial identifications." *(Supra,* at 271.)

Notwithstanding the unsatisfactory nature of the hearing testimony as to whether the identifying witness had actually observed the features of those whom he identified on the street, the facts of this case present a helpful introduction to the issue. At issue here are station house viewings by the victim of a robbery of two persons arrested on the basis of his "identification" of them on the street while he was accompanying the police who had responded to his complaint. The complaining witness reaffirmed his identification of 1 of the 2 arrested persons, the defendant. As to the other arrested person, the witness stated he was no longer sure that he was the second participant in the robbery.

Almost certainly as a result of this station house viewing, the charges against the second arrested person were dismissed. It is consistent with the limited information available that the station house viewing, and the expression by the witness of his doubts as to the accuracy of his street identification, may well have precluded the possibility that the second arrested person would have been tried, and conceivably even convicted, on the basis of the street identification made under circumstances that may well have been persuasive to a jury of that person's guilt.

Nor is there any reason to suppose that the clearly positive

result of the station house viewings here is somehow unique to the case before us. Human experience suggests that from time to time a crime victim who has identified someone on the street in the immediate aftermath of a crime may, after a period of time and on a second viewing, be less certain of the accuracy of his original identification. Where the confirmatory identification procedure used here is followed, and has such a result, it may, as in this case, result in the dismissal of charges against a person arrested on the basis of a constitutionally admissible street identification, and in other cases it may result in the immediate release of such persons from custody. It is not easy to believe that a procedure motivated by a desire to protect an arrested person against the possibility of a misidentification, and which from time to time will have results protective of such persons, is violative of rights guaranteed by the Constitution. Nor do I believe that the opinion of the Court of Appeals in *People v Riley (supra)* is reasonably interpreted as supporting such an anomalous result.

In his appellate argument that a station house viewing of an already identified person violates that person's constitutional rights under the rule set forth in *Riley (supra)* unless a lineup is utilized, the defendant fails to consider three characteristics of that procedure which the Court of Appeals had no occasion to address in *Riley,* and which fundamentally transform the nature of the relevant constitutional inquiry.

First, the concern underlying *Riley (supra)* that the suggestiveness of a station house showup viewing may unacceptably increase the possibility of a misidentification has little, if any, relevance to a situation in which the witness has already identified the arrested person under constitutionally acceptable circumstances, and is thereafter asked to look again at someone whom he has already identified, and whom he knows he has already identified, to determine whether he continues to be sure of the correctness of that identification.

Second, the reasons for preferring lineup identification procedures are virtually nonexistent where a member of the lineup is someone whom the viewing witness has already identified. Whatever may be the correctness of the original identification, it surely will be rare that the viewing witness will not recognize in the lineup the person whom he had identified only a short period before. Where the witness recognizes a person in the lineup as someone he previously identified, the presence of others in the lineup is not likely to add any additional trustworthiness to the reliability of the second

identification. Where a lineup includes someone identified shortly before by the viewing witness, it is realistically as suggestive as a showup, if suggestiveness is relevant to the intended purpose of the second viewing, which I do not believe to be the case. In fact, the principal practical effect of using a lineup for a second station house viewing of an already identified person will be to enable a trial prosecutor to argue deceptively that the jury should give additional weight to the station house identification because the defendant was selected out of a lineup.

Finally, it is unrealistic to suppose that busy police officers will think it necessary to allocate police time and resources, and to further impose on the time and convenience of a crime victim, to arrange a lineup with respect to someone already identified under constitutionally permissible circumstances in order to confirm that the earlier identification was accurate. In effect, the rule urged by defendant discourages the use of a confirmatory procedure with a real potential to exculpate a person unjustly accused of a crime on the basis of a prior misidentification. It discourages the use of such a procedure in the form in which it is most likely to be used by police officers, and does so without any realistic expectation that in the usual situation the police will conduct any confirmatory viewing at all if they are required to use lineups in such circumstances. Coupled with the reality that lineups have little, if any, advantage over showups in the situation with which we are concerned, the effective result of such a rule would be to discourage the use of a practical procedure whose principal beneficiaries will be persons arrested on the basis of a street identification as to which the complaining witness may be less certain on a second viewing. I do not believe that the Constitution, or the opinion in *Riley (supra)*, requires so dubious a result.

It does not follow from the conclusion that the Constitution would not be violated by such a procedure that testimony with regard to such a station house confirmatory viewing should necessarily be admitted as evidence. In the kind of situation with which we are concerned, I think that a Trial Judge might reasonably exercise his discretion to exclude testimony with regard to the station house identification, not because the defendant's constitutional rights were violated, but because the probative value of the confirmatory identification of an already identified person is insufficient to justify a repetition of what is in essence a single identification.

I have considered whether it would be appropriate for an

appellate court to set forth as a general principle, on the basis of this balancing test, that testimony with regard to a station house confirmatory viewing should be excluded. I am inclined to think that such a general rule would be unwise because factual variations in individual cases, as well as unexpected trial developments, make the issue more appropriately one for the exercise of discretion by a trial court. But the statement of such a general principle based on familiar balancing considerations appropriate to admissibility would seem to me far preferable to an untenable constitutional rule that would discourage police use of a confirmatory procedure whose principal beneficiaries are likely to be erroneously identified defendants.

Asch, J. (dissenting in part).

Complainant Steven Rothman was robbed at gunpoint on West 41st Street by two men. He ran to the Port Authority Terminal and told Police Officers Timothy Norris and Francis Cirino that the two robbers were then running eastward on 41st Street. He gave full and detailed descriptions, saying that the man who held the gun and stood directly in front of him was black, wearing a green Army fatigue jacket and a maroon hooded shirt. He described the man who stood behind him and frisked him as black and wearing a multicolored shirt, dark pants and a dark ski hat.

The officers and complainant ran eastward on 41st Street. Officer Norris, who was ahead of the two others, spotted two men fitting the description given by complainant. After losing sight of them temporarily, he saw them again coming up the Seventh Avenue subway stairs. He detained the two men, one of whom was the defendant, and when complainant arrived on the scene, he exclaimed, "that's them, that's them." Shortly afterwards, at the Port Authority precinct, complainant viewed each of the two men separately in a showup. He once again identified defendant as the robber who had stood directly in front of him but was unable to confirm the identity of the second man.

Defendant's contention that evidence of this confirmatory showup should have been suppressed is, at first blush, not without some surface persuasion. Thus, the Court of Appeals has recently stated: "Unreliability of the most extreme kind infects showup identifications of arrested persons held at police stations, and the evidence will be inadmissible as a matter of law unless exigency warrants otherwise." *(People v Riley,* 70 NY2d 523, 529.)

However, the facts in this case are radically different from

those in the usual precinct showup addressed by the *Riley* court. In *Riley (supra)* the defendant was identified by the complainant after she had seen and identified her stolen property and the gun used in the robbery, which were in the same precinct room as the defendant. Riley and his codefendant Jones (who was also identified by the complainant) were the only nonuniformed persons in the room *(People v Riley, supra,* at 527). Likewise, in the related case, defendant Rodriguez and another suspect were identified by a complainant as the State Police barracks, handcuffed together, in civilian clothes, accompanied only by uniformed officers *(supra,* at 528). In both cases, the complainants had *not* made any on-the-scene identifications prior to the showups held in the station houses. Therefore, as the court held, the showups in the precincts were infected with "[u]nreliability of the most extreme kind" *(supra,* at 529).

Here, on the other hand, the showup of defendant and the other suspect was *solely* confirmatory after a previous identification and precise description by the victim near the scene of the crime. Thus, the danger of suggestiveness in the procedure employed was not present since the identification had already taken place *(see, People v Collins,* 60 NY2d 214, 218-219 [where witness and defendant knew each other prior to crime]; *see also, People v Higgs,* 111 AD2d 410, 410-411: "The precinct house viewing of the suspect was not an independent identification procedure, but rather, was a prompt confirmation of the prior spontaneous identification made by complainant to the officer on the street * * * The confirmation procedure was not impermissibly suggestive, as the identification had already occurred"). As the People note, the fact that the complainant retracted his earlier identification of the other suspect additionally points out the lack of suggestiveness in this confirmatory viewing.