OPINION OF THE COURT
John J. Reilly, J.
Dennis Simpson is charged in New York Indictment No. 372/80 in a single count of rape in the first degree, four counts of unlawful imprisonment in the second degree and one count of unauthorized use of a motor vehicle. Mr. Simpson has moved this court to suppress a telephone conversation between himself and Jonathan Carter which was recorded by him based on a request of Federal Special Agents Milton R. Graham and Steven Heubeck on the evening of October 30, 1979, at Stamford, Connecticut.
The issue for decision by this court is one of first impression upon which no prior New York court has spoken. The novelty of the issue is noted in a major decision of the New York Court of Appeals in the case of People v Kazmarick (52 NY2d 322, 328).
Judge Meyer, speaking for a majority opinion of the Court of Appeals tended to emphasize the novelty of the issue as follows:
*44 “None of our decisions go so far, however, as to hold the police bound because they had reason to know of another charge on which defendant’s right to counsel has attached, as defendant urges.
“We do not find it necessary on the present record to determine whether or under what circumstances knowledge, actual or constructive, by the police of a pending unrelated charge against defendant will be sufficient to put them on notice that defendant is in fact represented by counsel on that charge and, therefore, may not be interrogated on the new matter, absent waiver of counsel in the presence of counsel. Obviously, if the suspect informs the police that he has a lawyer on an unrelated pending case his right to counsel on the new matter will indelibly attach and bar interrogation (People v Cunningham, supra; People v Servidio, supra). Short of such direct advice, however, even actual knowledge by the police that there is a pending unrelated charge, such as defendant Kazmarick’s shoplifting offense, cannot charge them with any more information than would have been revealed had the police made reasonable inquiry concerning whether defendant in fact had counsel on the unrelated charge.” (People v Kazmarick, supra, pp 328-329.)
A secondary issue to be decided is whether or not under all the circumstances the recorded statement was voluntary.
Addressing ourselves to the issue this court has to decide whether or not under the particular circumstances of the instant case the Westchester prosecutor is barred from using People’s Exhibit No. 1A, a Federally recorded tape made by the F.B.I. of a Federal suspect in the State of Connecticut while investigating the Federal crime of kidnapping of which Dennis Simpson was suspect.
The F.B.I. was notified by the Stamford, Connecticut, police force on October 24, 1979, of a reported kidnapping and rape.
The F.B.I. obtained an incident report filed by the Stamford police on October 23, 1979, which reported that three individuals asked the police for a ride to a donut shop located at the Strawberry Hill section of Stamford.
*45 On October 24, 1979, Special Agent Heubeck spoke with Detective Carol Cope, a Westchester police officer and asked for information on Dennis Simpson, which was provided on October 27, 1979, by Detective Suppa of the Portchester police.
Based upon information that there were three individuals like Jamaicans, one of whom spoke “Pig Latin” at the Stamford Railroad Station on the night of October 23, 1979, who wore certain descriptive clothing and who were interested in going to Mount Vernon or Portchester, Special Agents Graham and Heubeck went to Mr. Donut at Stamford, Connecticut, and asked the manager, Jonathan Carter, whether or not he knew of such an individual from Portchester. Carter told the F.B.I. agents that Dennis Simpson spoke “Pig Latin”, had been to his Mr. Donut Shop on October 23, 1979, with two other individuals and that Dennis Simpson lived with his grandmother in Portchester. He stated that Dennis Simpson came frequently to the donut shop.
F.B.I. Agent Steven Heubeck spoke with Detective Suppa of the Portchester police and inquired whether he was familiar with Dennis Simpson and his background. The Portchester police gave the F.B.I. Dennis Simpson’s current address, the names of people he associated with and numerous recent encounters he had with law enforcement officers. He mentioned that Dennis Simpson had a street encounter with Portchester police officers on October 26, 1979, involving Police Officers Ek and Miller.
The F.B.I. learned the identity of the individual with Dennis Simpson on October 26, 1979, was “Brutus” David Delaney. There was no report that the defendant had been arrested.
A photo of Dennis Simpson was provided by the Portchester police and they learned that Dennis Simpson had been involved in a burglary in July, 1979, and that he had an extensive criminal record. At no time prior to October 29, 1979, did the F.B.I. know that any warrant had been issued for Dennis Simpson or that any attorney represented him in any criminal matter.
Special Agent Heubeck had told Detective Suppa of the Portchester police that Dennis Simpson was a suspect in a *46 bank robbery involving a stolen car in an effort to disguise his real motive for seeking him in connection with his Federal kidnapping. He used this subterfuge to prevent the Portchester police from jeopardizing the F.B.I. investigation of the Federal kidnapping. Upon deeper reflection being convinced that Detective Suppa of the Portchester police could be trusted and would not jeopardize the F.B.I. investigation, on Sunday, October 28, 1979, Special Agent Heubeck informed Detective Suppa that Dennis Simpson was wanted for Federal kidnapping, related rape, robbery, and car theft. Special Agent Heubeck took a picture of a colored Polaroid photo of Dennis Simpson (People’s Exhibit No. 3S) which had been supplied by Detective Suppa.
On October 25, 1979, Police Officer Golino and Police Officer Sinaguglia of the Stamford police together viewed a book of pictures and selected one which they said resembled one of the three individuals whom they saw at the Stamford Railroad Station on October 23, 1979. People’s Exhibit Nos. 3U and 3V constitute montages separately made by Golino and Sinaguglia of the same individual, one of the three who had a silk stocking cap on his head and wore a blue jacket with writing on it. Golino and Sinaguglia in each other’s presence selected a picture of a man identified as “Thyndel Brooks” which each said resembled the largest of the three individuals who were at the railroad station.
Carter told Special Agent Graham that at approximately 12:50 Saturday morning on October 27, 1979, he had received a telephone call from Dennis Simpson. The defendant, Dennis Simpson, told Jonathan Carter in the telephone conversation that he was involved in the kidnapping and wore a stocking hat and that the kidnapped car was dropped downtown. Dennis Simpson stated on the telephone that he had seen a red car go by his home in Portchester and suspected that it was driven by the police.
Based upon the telephone conversation between Jonathan Carter and Dennis Simpson, Jonathan Carter suggested that F.B.I. search for the kidnapped car in New York City along Lenox Avenue from 120th to 121st Street or further north to 132nd and Lenox because Jonathan Carter knew that Furman had relatives living in the area.
*47 On October 29, 1979, Special Agents Graham and Heubeck asked Jonathan Carter if he would permit them to put a recording machine on his telephone to record any further conversations he would have with Dennis Simpson.
On October 30, 1979, Jonathan Carter signed a waiver, People’s Exhibit No. 1, and gave permission to the F.B.I. to put a recorder on his Connecticut phone to record any future phone conversations with Dennis Simpson, because Jonathan Carter said Dennis Simpson was influencing his brother and he wished to stop it.
While Jonathan Carter expressed a desire not to become involved in any court proceedings, Special Agents Graham and Heubeck established that they did not make any promise to him that if he recorded a phone conversation with Dennis Simpson, he would not become involved.
The F.B.I. installed the phone recording equipment on October 30,1979, and showed Jonathan Carter how to use it. He said that he also owned a recorder and was familiar with its use.
Special Agent Graham offered to assist Jonathan Carter financially in consideration for his co-operation. While Jonathan Carter at first refused, he later stated that he could use the money to buy his mother a present. It was long after People’s Exhibit No. 1A was first made, that any payment took place.
On October 30, after the F.B.I. left his home, Jonathan Carter contacted Dennis Simpson by telephone and taped the conversation. His conversation lasted about 25 to 27 minutes (People’s Exhibit No. 1A). After the conversation was finished, Jonathan Carter disconnected the equipment, wrapped it up and left it seated on nearby furniture.
On October 31, 1979, the following morning, Jonathan Carter contacted Special Agent Graham and told him he had recorded a conversation with Dennis Simpson. Mr. Carter stated that during the phone conversation, Dennis Simpson told him that the girl had been raped by Bruce Furman and “Brutus”. On the same date, at Jonathan Carter’s house, Agent Graham picked up People’s Exhibit No. 1A and related equipment. The door of Mr. Carter’s apartment was opened by a female, identified as Johanna *48 Pratt, who handed the tape and equipment to Special Agent Graham saying that Jonathan Carter had told her to do so.
Subsequent efforts by the F.B.I. to locate Johanna Pratt were to no avail. She could not be located at her brother’s house in Stamford, Connecticut, or mother’s house in Pennsylvania. Her whereabouts were unknown.
Upon receiving the tape, Special Agent Graham took it to his car where he and Special Agent Heubeck listened to it.
Dennis Simpson after he was arrested on November 1, 1979, indicated that he wanted to make a statement. Upon arrival at F.B.I. New Rochelle Headquarters, F.B.I. Agent Ancin advised him of his legal rights and indicated that he could have counsel. The defendant indicated that he knew attorney Arlene Popkin. She was called, appeared and told the F.B.I. that she was representing him on prior New York indictments.
CONCLUSIONS OF LAW
The court finds that the F.B.I. agents on October 24, 1979, were investigating the Federal crime of kidnapping in the State of Connecticut under Federal law and procedure.
The court further finds that the tape-recorded conversation of the Federal suspect Simpson took place wholly in the State of Connecticut and was not subject to New York jurisdiction or any of its decisional law.
At the time the Federal agents used Jonathan Carter, based on his consent to record his phone conversation with the Federal suspect, Dennis Simpson was not in police custody in any State or Federal jurisdiction. At the time no criminal adversary proceedings had been commenced on the suspected Federal kidnapping.
The method and procedure by which the F.B.I. on October 30,1979, got the voluntary consent of Jonathan Carter to make and record his telephone conversation with Simpson was not in violation of any Federal law or procedure. (United States v Simpson, US Dist Ct, May 19, 1980, Dailey, J.)
*49 Additionally at the time the tape recording was made by the Federal law enforcement agents it did not violate any known existing laws of New York State (People v Kazmarick, 52 NY2d 322, supra).
The purpose for which the F.B.I. on October 30, 1979, had People’s Exhibit No. 1A recorded was to investigate Simpson as a suspect in a Federal crime.
No evidence was adduced at the hearing that established that prior to November 1, 1979, the Special Agents Graham, Heubeck or Ancin had knowledge actual or constructive that Dennis Simpson had an attorney representing him on prior New York felony Indictment Nos. 1068/78 and 131/79.
At the time the F.B.I. recorded Simpson’s telephone conversation in Connecticut there was no evidence adduced at the hearing that established that any New York law enforcement official either had foreknowledge or knowledge that the F.B.I. intended to make the tape recording. Further, no evidence was adduced that the F.B.I. at any time told the police that they had made the recording.
It is most significant that no evidence was adduced that established that any New York law enforcement officer prior to October 30, 1979, informed the F.B.I. that the Federal suspect Simpson had counsel on prior unrelated felony indictments.
Particularly, no evidence was adduced at the hearing that the F.B.I. had any relationship of an agency between themselves and any New York law enforcement officials.
Accordingly, this court finds that in making the recording of People’s Exhibit No. 1A, the F.B.I. were in no manner agents for New York State law enforcement officials.
Defendant contends that the Washington Central Bureau of the Federal Bureau of Investigation had been notified by New York police that Simpson was represented by counsel on prior New York Indictment No. 1068/78 and New York Indictment No. 131/79.
It is contended, therefore, that the Central Bureau of Investigation had actual knowledge that Simpson was represented by counsel with the result that the special *50 agents in the field constructively were charged with the same knowledge (People v Garofolo, 46 NY2d 592; People v Pinzon, 44 NY2d 458).
At the hearing documentary evidence was produced (defendant’s Exhibit No. A1 attached) which defendant contends imputes actual knowledge to the F.B.I. that Simpson was represented by counsel on New York Indictment Nos. 1068/78 and 131779.
An examination of defendant’s Exhibit No. A1 attached at the most establishes that the Central F.B.I. Office was informed of the suspect’s status under arrest charges. The court finds based on the authority of People v Servidio (77 AD2d 191, supra) that such evidence fails to establish that the F.B.I. had knowledge, actual or constructive, that the suspect Simpson had a counsel representing him on any unrelated criminal charges. In resolving this issue, Presiding Justice Hopkins, in the Servidio case (supra) stated (pp 196-197):
“We think that the contention that we must place at forfeit the interrogation of a suspect because of a failure of the police to inquire concerning the suspect’s status as a defendant under other pending charges distorts the principle and imposes a burden on the police so difficult of performance as to be well-nigh impossible. In the instant case, for example, the defendant had been arrested on charges in the District Court of Suffolk County some seven months previously, and was free, apparently on bail or on his own recognizance, awaiting sentence. The defendant did not inform the police of these facts, nor was there any patent evidence that the defendant was represented by counsel as to other pending crimes.
“A holding consonant with the defendant’s contention of constructive knowledge would necessarily mean that before beginning the questioning of any suspect — even one apprehended within minutes of the crime and in possession of the fruits of the crime such as the defendant here — the police must either investigate the court records of pending cases within the jurisdiction or add another inquiry to the Miranda cautions to obtain information from the defendant as to the existence of other prior charges against him *51 which are undisposed of. We see no reason to impose another condition precedent on police questioning, particularly when the defendant knows the facts concerning his status as an offender and could readily inform the police at the time of questioning that he is represented by counsel.
“In short, we think that in accordance with the precept stated in People v Pinzon (44 NY2d 458, 464, supra), we should focus on whether the police actually had knowledge of the representation of the defendant by counsel — ‘[W]hat is required must always be considered in light of what is practical under the circumstances’. The balance between the rights of the individual and the responsibilities of the State will be fairly maintained if actual knowledge, not constructive knowledge, is the ingredient of the rule forbidding the interrogation of a suspect when he is represented by counsel on unrelated charges unknown to the police. This does not mean that the police may act by subterfuge to conceal such knowledge, or to overlook the obvious. Equally, it means that the police undertaking the questioning must be possessed with the knowledge of the prior representation.”
The New York Court of Appeals in the case of People v Kazmarick (52 NY2d 322, 327-328, supra) expressly ruled on defendant’s contention in the above regard as follows: “Defendant in an overly simplistic lumping of the two lines of cases argues from Samuels that the arrest warrant and accusatory instrument on the shoplifting charge created a nonwaivable right to counsel and from Rogers that attachment of that right prevented interrogation on any other criminal matter. While the filing of an accusatory instrument triggers a right to counsel with respect to the charge made by the accusatory instrument, the right to counsel and representation by counsel are not the same thing. The fact that defendant Kazmarick may have been entitled to counsel on the shoplifting charge does not require, automatically and in all events, acting as though he was in fact represented by counsel and, therefore, protected even as to an unrelated charge. Simply put, the legal fiction of representation indulged by the Samuels line of cases is not tantamount to the actual or requested representation pro *52 tected by the Rogers-Cunningham line. To accept the ‘strict liability’ rule for which defendant argues would tax. law enforcement officials anywhere with knowledge of accusatory instruments on unrelated charges everywhere, and unnecessarily and unrealistically limit police interrogation procedures (see People v Servidio, 77 AD2d 191; cf. People v Miller, 76 AD2d 576).”
Further, no evidence was adduced at the hearing that any member of the F.B.I. had actual knowledge that counsel had appeared and was representing the Federal suspect in New York.
The court has searched the record in order to ascertain whether or not law enforcement officials as of October, 1979 may be imputed to have had knowledge, actual or constructive, which would cause the court to suppress People’s Exhibit No. 1A (defendant Simpson’s telephone conversation with Jonathan Carter).
In an attempt to answer the question, the court notes that the Rogers rule was seven days old at the time the F.B.I. made People’s Exhibit No. 1A.
Even then (October, 1979) the Rogers rule did not create any legal bar in the circumstances of the instant case.
Subsequently, the progeny of the Rogers rule was extended to new factual situations, none of which provided any legal prohibition on the part of the police under the circumstances in which the F.B.I. made People’s Exhibit No. 1A. (People v Cunningham, 49 NY2d 203; People v Samuels, 49 NY2d 218; People v Marrero, 51 NY2d 56; People v Skinner, 52 NY2d 24.)
Prior to People v Kazmarick (52 NY2d 322, supra), no rule of law provided any knowledge that a mere suspect, absent any in-custody police interrogation, absent any known representation by counsel on the crime suspected, absent any adversary proceeding as to the crime suspected, could not waive his right to counsel except in the presence of counsel if the police had knowledge, actual or constructive, that the suspect was in fact represented by counsel on any unrelated crime.
It is axiomatic that ignorance of the law is no excuse. That axiom is not true, however, where the ignorance is *53 due to the absence of a promulgation of the law. The prior existing and prevailing law known in 1979 is an operative fact and it had consequences in the instant case that cannot be ignored (Linkletter v Walker, 381 US 618, 636). In the instant case, the controlling law was not enunciated until February 26, 1981 (People v Kazmarick, 52 NY2d 322, supra).
Even so, the 1981 rule is retroactive and controls the facts of the instant case on any appeal. (People v Whitaker, 75 AD2d 111.)
There can be no dispute that the Rogers rule was extended by the law enunciated in the Kazmarick case so as to bar police interrogation of a suspect, if the police can be imputed to have knowledge, actual or constructive, that the suspect in fact is represented by counsel in any criminal proceeding (People v Kazmarick, supra).
Certain it is that as of February, 1981 the police may be imputed to have had such knowledge.
The resolution of the court’s inquiry, however, must be found under the circumstances that existed in the situation prior to that date.
Obviously in the prior situation (October, 1979) the police were ignorant to the extent that they had no conscious knowledge of the law that was to be enunciated for the first time in February, 1981. (People v Kazmarick, supra.)
The above circumstance brings to mind an old saying to the effect that ignorance is bliss. It must be concluded, therefore, that while the law enunciated in 1981 is deemed to control the facts of the instant case, it did not impose any conscious duty on the police until they learned of it in 1981.
Moreover, what the F.B.I. did not know in October, 1979, they had no conscious need to know or any conscious obligation to inquire whether the suspect was actually represented by counsel in any other criminal matter (People v Servidio, 77 AD2d 191, supra; People v Kazmarick, 52 NY2d 322, supra).
Likewise, the Portchester and the Westchester police in October, 1979, had no conscious need to notify the F.B.I. and, it is not strange under the circumstances that they did *54 not notify the F.B.I. about any pending crime. (People v Servidio, supra.)
The ignorance of the police in 1979 of any known legal obligation to provide any such information to the F.B.I. is not an unreasonable explanation as to why it was not done.
Under the above circumstances, it would be most unrealistic to impute to the F.B.I. knowledge actual or constructive that they had a duty to investigate and inquire as to whether or not the suspect actually had counsel on any other criminal matter. (People v Kazmarick, 52 NY2d 322, supra.)
Under the same circumstances it would also be unreasonable to impute to the New York police knowledge, actual or constructive, that they had any conscious duty or conscious obligation to notify the F.B.I. about the presence of counsel on any New York crime.
In view of the above, and based on a totality of all the evidence adduced at the hearing, the court finds, as it must, that in October, 1979, the F.B.I. had no knowledge that Dennis Simpson actually had an attorney representing him in an unrelated crime.
Accordingly, the motion to suppress People’s Exhibit No. 1A for failure to obtain a waiver of counsel in counsel’s presence is denied.
The court further finds that Simpson’s statement contained in People’s Exhibit No. 1A was made in an atmosphere free of any undue coercion or violation of due process, and that at the time he made it, it was voluntarily made by him beyond a reasonable doubt.
Accordingly, the motion to suppress, based on the contention that the statement was involuntarily made is denied.