OPINION OF THE COURT
Memorandum.
The order of the Appellate Division should be affirmed.
An undercover police officer carrying out his official duties on a Brooklyn street, in what is commonly referred to as the law enforcement technique of a narcotics "buy and bust” operation, purchased two foil packets of cocaine from defendant. The undercover purchasing officer radioed a description of defendant to the backup team of officers, who immediately responded to make the arrest at the site of the criminal transaction. Within five minutes, the purchaser-undercover police officer drove past that site and viewed defendant being detained at curbside by the backup arresting officers, an observation relied on by the suppression court in its ruling. Approximately three hours later, the purchaser-undercover officer also identified defendant through a one-way mirror at the local precinct as the person who sold him the cocaine.
A pretrial motion to suppress the identification testimony of the purchaser-undercover police officer was denied without a hearing. The officer testified at trial about the criminal transaction and identified the defendant. Defendant was thereafter convicted by a jury of criminal sale and criminal possession of a controlled substance in the third degree.
We conclude that the trial court did not err by denying defendant’s motion for a Wade hearing. It is not disputed that the identification was made by a trained undercover officer who observed defendant during the face-to-face drug transaction knowing defendant would shortly be arrested. Thus, there is evidence in the record to support the determination of the courts below that the officer’s observation of defendant at the station house approximately three hours later was not of a kind ordinarily burdened or compromised by forbidden suggestiveness, warranting a lineup procedure or Wade hearing. The viewing by this trained undercover narcotics officer occurred at a place and time sufficiently connected and contemporaneous to the arrest itself as to constitute the ordinary and *923 proper completion of an integral police procedure. Additionally, as we have observed in this kind of situation, it lent assurance that an innocent person was not being detained by reason of a mistaken arrest (People v Morales, 37 NY2d 262, 272). The undercover officer’s participation in the criminal apprehension operation at issue was planned, and he was experienced and expected to observe carefully the defendant for purposes of later identification and for completion of his official duties (id., at 271).
The station house viewing in this standard police operational procedure was not the kind of per se suggestive or improper bolstering present in show-up identifications by civilian witnesses (cf., People v Gissendanner, 48 NY2d 543, 552), too often resulting in misidentifications and thus warranting the strict rule we promulgated in People v Riley (70 NY2d 523). In sum, we imply no categorical rule exempting from requested Wade hearings confirmatory identifications by police officers by merely labeling them as such (see, People v Perez, 74 NY2d 637). Where the nature and circumstances of the encounter and identification may warrant, a hearing should and undoubtedly will be held. However, there is no basis in this record for us to conclude that the trial court, as affirmed by the Appellate Division, erred as a matter of law in denying the suppression hearing and motion.
Titone, J. (dissenting). In this "buy and bust” case, the issue is whether a defendant who has been identified by an undercover police officer in a pretrial station house procedure is entitled to a hearing pursuant to CPL 710.60 (4) to determine whether the identification was tainted by any unnecessarily suggestive factors. The majority memorandum rejects this defendant’s claim of entitlement to a hearing and affirms his conviction, but leaves this important legal question unanswered. Inasmuch as my own analysis leads me to conclude that a hearing is required in these and similar circumstances, I must respectfully dissent.
At the outset, I note my agreement with the majority’s observation that merely labeling a pretrial identification procedure "confirmatory” neither advances analysis nor justifies the refusal to hold a hearing. Indeed, although the Appellate Divisions have often used the term in this context (see, e.g., People v Thompson, 149 AD2d 634; People v Davis, 141 AD2d 831; People v Francis, 139 AD2d 527; People v Leacraft, 128 AD2d 640; People v Marrero, 110 AD2d 785; People v Stanton, *924 108 AD2d 688, 689), its application to street "buy and bust” cases or other crimes in which the police officer has had his first contact with the alleged perpetrator at the time of the crime is, at best, questionable.
The "confirmatory identification” label, as well as the premise that such identifications are not subject to testing for suggestiveness, is apparently derived from two prior decisions by this court, People v Gissendanner (48 NY2d 543, 551-553) and People v Morales (37 NY2d 262, 271-273). In Gissendanner, the court held that CPL article 710’s notice and hearing procedures for testing the constitutional propriety of pretrial identification procedures are not applicable in cases where "the defendant’s identity is not in issue, or * * * the protagonists are known to one another” (48 NY2d, at 552, supra). This holding was premised on the conclusion that the due process concern for the suggestiveness of a pretrial procedure is not implicated in such situations (id.; see, People v Collins, 60 NY2d 214, 218-219; see also, People v Tas, 51 NY2d 915).
In People v Morales (supra), this court declined to disturb the finding of the trial court, made after a traditional Wade hearing, that a police officer’s station house viewing of an arrestee following the latter’s alleged sale of narcotics to the officer was not unduly suggestive. In so ruling, the court relied on three factors: the officer’s expertise and training in the observation and retention of details relevant to identification, the absence of " 'unnecessarily suggestive’ ” procedures and, finally, the fact that "the viewing had not been for the purpose of identification but for [the officer] to assure himself that his backup team had arrested the man he intended.” (Id., at 271, 272.) The first two of these factors were obviously relevant to the traditional due process inquiry into whether a particular procedure created a risk of suggested or mistaken identification. While the relevance of the third factor, which is the apparent source of the "confirmatory identification” doctrine, may initially seem somewhat murky, closer analysis reveals that it too was considered in Morales as part of the court’s traditional due process inquiry.
As one commentator has observed, the "unnecessarily suggestive” prong of the Stovall v Denno (388 US 293) due process analysis "can, in turn be broken down into two constituent parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures” (1 LaFave & Israel, Criminal Procedure § 7.4 [b], at *925 581). Specifically with regard to one-person showups, we have recognized that such procedures are inherently suggestive, but are nonetheless permissible where justified by necessity, including the need for prompt assurance that an innocent person has not been mistakenly detained (People v Riley, 70 NY2d 523, 529; People v Rivera, 22 NY2d 453, cert denied 395 US 964; see, e.g., People v Love, 57 NY2d 1023; People v Logan, 25 NY2d 184, cert denied 396 US 1020 [cited in Morales]; see also, Russell v United States, 408 F2d 1280, 1284, cert denied 395 US 928 [cited in Morales]).
In light of these principles, Morales’ extended discussion of the distinction between viewings conducted for the purpose of identification and those conducted for the purpose of "confirmation” can only be understood as an effort to demonstrate that the inherently suggestive one-person showup conducted there was permissible nonetheless because it was initiated merely to assure that the police had arrested the right man. Indeed, the court itself stated that the station house viewing, which it had determined to be "confirmatory,” was "far from being improper, actually 'consistent with good police work’ * * * since it assured that an innocent man was not incarcerated by someone else’s mistake.” (37 NY2d, at 272 [citations omitted].)
Thus, Morales does not stand for the proposition that so-called "confirmatory” identification procedures conducted in connection with a "buy and bust” operation are not subject to the traditional due process analysis that is ordinarily implemented through the procedural vehicle of a Wade hearing. To the contrary, Morales actually stands for the very different proposition that the "confirmatory” nature of a particular viewing is a significant factor to be considered in determining whether the Stovall v Denno (supra) due process standard has been satisfied. Indeed, the Morales holding was reached only after a Wade hearing had been held and the facts necessary to resolving the due process inquiry had been fully explored.
In short, neither Morales nor Gissendanner may be read to justify the summary denial of a Wade hearing under the circumstances presented by this case. While it is true that the police officer in this case was acquainted with the person he identified as defendant by virtue of their alleged contact during the sale, the Gissendanner rationale has no application. In this regard, the court’s observations in People v Collins (supra, at 219 [emphasis supplied]) are most apt: "This, of course, is necessarily a question of degree. When a crime *926 has been committed by a family member, former friend or long-time acquaintance of a witness there is little or no risk [of taint through police suggestion]. * * * But in cases where the prior relationship is fleeting or distant it would be unrealistic to ignore the possibility that police suggestion may improperly influence the witness in making an identification. ”
Here, as is apparent from his trial testimony, the officer’s contact with the drug seller, lasting only seconds, was "fleeting” and certainly did not establish the level of familiarity contemplated by Gissendanner. Moreover, unlike Gissendanner, the seller’s identity was very much at issue in defendant’s trial. Accordingly, a hearing to explore "the possibility that police suggestion may [have] improperly influence[d] the [identifying] witness” should have been conducted, unless there exists a special rule that obtains when the identifying witness is a police officer who was pursuing his investigative duties at the time his observations were made (but see, People v Perez, 74 NY2d 637, 638).
The majority here has expressly declined to adopt such a "categorical rule” (majority mem, at 923). Yet, in the absence of a categorical rule, it is difficult to justify the majority’s conclusion that a hearing was not required in this case. Indeed, while acknowledging that "a hearing should and undoubtedly will be held” "[w]here the nature and circumstances of the encounter and identification may warrant” (id.), the majority has made no effort at all to suggest when such circumstances might exist, much less to explain how this case is distinguishable from those yet-to-be-described cases in which a hearing must be held.
Short of adopting a per se rule that, because of their training and special expertise, identifications by police officers acting in pursuit of their duties are never subject to suggestiveness — a rule that I would find unacceptable[1] — there is really no sound basis for denying Wade hearings where a police officer has made a station house identification following a successful street "buy-and-bust” encounter. First, CPL 60.25 and 60.30, the very foundations for the admission of out-of-court identifications as evidence-in-chief pertaining to identity, require that the circumstances under which the evidence was obtained be "consistent with such rights as an accused person *927 may derive under the constitution of this state or of the United States,” a test that is ordinarily explored through the procedural mechanism of a Wade hearing. Notably, the statutes make no exception for police officer-witnesses.
Second, although a particular officer’s training and special experience are certainly relevant to determining his susceptibility to suggestive circumstances, it cannot be said that they obviate the need to examine all of the specific events surrounding the identification to ascertain whether some suggestive circumstance, above and beyond the inherently suggestive nature of the showup procedure itself, irreparably tainted the identification (see, People v Rubio, 118 AD2d 879, 880). In People v Baez (103 AD2d 746), for example, the Wade hearing revealed that before viewing the suspect, the police officer had been shown a photograph of the suspect by a colleague and been told that the person depicted was arrested for another drug sale as well. Similarly, in People v Chillis (60 AD2d 968) a serious question about the reliability of an undercover’s identification testimony was held to warrant a Wade hearing where the undercover’s description of the suspect changed dramatically after he was shown a "mug shot” at police headquarters (see also, People v Perez, supra). Finally, in People v Williams (79 AD2d 929), it was disclosed during the Wade hearing that the undercover identified the defendant after he was told that the suspect arrested had been found with the "buy” money on his person.
It may well be that the foregoing examples represent precisely the type of circumstances that the majority refers to when it acknowledges that a hearing should be held in some cases. However, the idea of making the right to a Wade hearing turn upon the "nature and circumstances of the encounter” is fatally flawed because of its obvious circularity. The true "nature and circumstances” of a particular encounter ordinarily cannot be ascertained without a hearing in which testimony is taken, cross-examination is had and the evidence is evaluated by the trier of fact, for both credibility and reasonableness. Thus, to make the right to a hearing depend upon the specific events in the case, as the majority appears to do, is to establish what will, in most cases, amount to an insuperable threshold.
The majority’s own analysis of the facts in this case demonstrates the weakness of its legal approach. In determining that this defendant was not entitled to a Wade hearing, the majority relies upon the bare undisputed facts revealed by the *928 motion papers, i.e., that the officer was trained, that he made his observations in anticipation of a subsequent arrest and that only three hours had elapsed between the initial encounter and the identification. The majority then goes on to uphold the mixed "determination of law and fact” (see, People v Dickerson, 50 NY2d 937) purportedly made by the courts below that "the officer’s observation of defendant at the station house approximately three hours later was not of a kind ordinarily burdened or compromised by forbidden suggestiveness” (majority mem, at 922).
However, since the trial court’s ruling was made upon motion papers alone — and before any hearing was held — it is difficult to understand how such a mixed conclusion could have been drawn. CPL 710.60 (3) permits summary denial of a suppression motion only where the motion papers fail to "allege a ground constituting legal basis for the motion” (CPL 710.60 [3] [a]) or "[t]he sworn allegations of fact do not as a matter of law support the ground alleged” (CPL 710.60 [3] [b]; see, CPL 710.60 [4]).[2] Yet, as we have stated on at least one occasion, mixed questions of law and fact "can rarely be resolved as a matter of law even when the facts are not in dispute” (People v Harrison, 57 NY2d 470, 478). By upholding a mixed "determination” on the basis of so-called "evidence in the record” where the record consists only of motion papers, the majority has brought about a drastic change both in the fundamental precepts of criminal motion practice and in the prior traditional concept of "evidence,” which was always thought to mean testimony or exhibits admitted at an adversary hearing.
Even more importantly, to arrive at the mixed conclusion the majority now endorses, the courts below had to adopt a chain of assumptions, without any basis in the pretrial record, about what did (or did not) occur before the corporeal viewing in the station house took place. The conclusion assumes, for example, that none of the identifying officer’s colleagues informed him that the person arrested had a prior history of drug arrests (cf., People v Baez, supra) or that the person was found with "buy” money or drugs (see, People v Williams, supra). Such circumstances would certainly have raised a *929 serious question about the reliability of the officer’s identification, notwithstanding that the procedure may have occurred only three hours after the sale (see, majority mem, at 922). Yet, because the ruling below, which the majority now affirms, short-circuited the usual fact-finding process represented by a Wade hearing, the occurrence or nonoccurrence of these or other similar circumstances is, and will remain, a matter of speculation.
Inasmuch as there seems to be no other realistic method for ruling out the possibility of improper suggestiveness, with its attendant risk of unreliable identification and miscarriage of justice (see, United States v Wade, 388 US 218, 228 [and authorities cited therein]), I would hold that, regardless of whether it may or may not be labeled "confirmatory,” a police officer’s pretrial viewing of the defendant must be tested in the crucible of an adversary Wade hearing if the officer’s identification testimony is to be offered at trial. Clearly, regardless of the purpose of the viewing, suggestive conduct by fellow officers, if it occurred, would raise due process concerns, leading to a legitimate question about the procedure’s consistency with the State and Federal Constitutions (see, CPL 60.25, 60.30).[3]
As cases such as People v Chillis (supra), People v Baez (supra) and People v Williams (supra) reflect, even trained police officers who have observed the suspect with professional detachment are subject to suggestive influences. Indeed, although the risk of misidentification may be diminished in cases involving police witnesses because of their expertise and relative detachment, there are special problems associated with station house police identifications following street "buy and bust” operations that raise reliability questions not present in ordinary pretrial identification procedures. As is evident from the trial record in this case, "buy and bust” teams ordinarily have many encounters and make many "buys” during the course of their shifts before they return to the station house to "confirm” the arrests made by their backup *930 teams. Accordingly, they must retain in their memories the details of many intervening faces and events, all of which relate to essentially similar transactions. Furthermore, the undercover’s contact with the drug seller often is fleeting and takes place under circumstances that are not conducive to careful observation because of the officer’s wish to avoid arousing suspicion. Finally, although I do not suggest that a police officer would knowingly identify the "wrong” person, it cannot be denied that there is a certain degree of suggestion inherent in the very fact that the officer’s own backup team, consisting of individuals with whom he may work on a regular basis, has made an arrest on the basis of the officer’s description.
For all of these reasons, I do not believe that the expertise and detachment that ordinarily accompanies identifications by police officers obviates the need to test such identifications for suggestive influences that might impair their accuracy. Accuracy of the postarrest station house identification is particularly critical in cases such as this, since, unlike the ordinary citizen witness who typically have few encounters with crime, a police officer may have contact with hundreds of suspects in the time between the arrest and the trial. Accordingly, the police officer’s in-court identification testimony, if any, is likely to be discounted, and, concomitantly, his testimony describing the station house identification that took place shortly after the arrest is likely to take on great probative significance.
Since the hearing mandated by CPL 710.60 (4) is the only practical method of assuring that all of the facts necessary to assessing the reliability of the officer’s identification testimony are elicited, I would hold that such a hearing was required here, and is required, in general, in cases involving station house procedures in which individuals who are not personally acquainted with the suspect, whether they are police officers or civilians, are asked to make an identification. Accordingly, I dissent from the majority’s decision to affirm and vote instead to give defendant the relief he seeks, at least to the extent of remitting for a Wade hearing.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander and Bellacosa concur; Judge Titone dissents and votes to reverse in an opinion in which Judge Hancock, Jr., concurs.
Order affirmed in a memorandum.

. Indeed, on oral argument, even the People eschewed reliance on any per se rule that would insulate "confirmatory” identifications from Wade review in all cases.

. For example, under this provision, a request for a Wade hearing could properly be denied summarily if there was undisputed proof that the identifying officer and the defendant were personally acquainted before the alleged crime or the identity of the alleged perpetrator was not in issue (see, People v Gissendanner, 48 NY2d 543).

. This is not to suggest that a lineup necessarily must be held every time a police officer is called upon to make a station house identification. In this regard, the police officer’s special training and expertise, on which the majority has placed so much reliance, may well be a significant factor in determining what procedures due process requires. In any event, the question whether a one-person station house identification procedure is permissible is not before the court on this appeal and need not be decided here (but see, majority mem, at 922).