THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS ROBERTS, Also Known as THOMAS ROBINSON, Also Known as LESTER BOWLES, Appellant.

First Department, July 18, 1991

## APPEARANCES OF COUNSEL

*Harold V. Ferguson, Jr.,* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Diana Fabi* of counsel *(Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

On appeal from his conviction of two counts each of criminal sale and criminal possession of a controlled substance in the third degree arising out of two separate sales of cocaine to an undercover officer, defendant argues, *inter alia,* that the trial court erred in admitting evidence of the undercover officer's station-house identification of him, the constitutionality of which, he contends, the People failed to prove.

The facts are not in dispute. At 3:40 P.M. on March 26, 1987, Police Officer Louis Prince, a five-year veteran of the New York City Police Department, who had made an estimated 150 undercover purchases of narcotics, purchased a quantity of cocaine for $50 from defendant inside apartment 2C at 505 West 164th Street in Manhattan. Officer Prince had been led to the apartment by a man, later referred to as J.D. Eddie, whom he had met outside the building. Defendant, described by Officer Prince as a black man, with a dark complexion, approximately six feet tall, and 40 years of age with a salt and pepper afro, answered the door and, after looking Prince "up and down", asked J.D. Eddie, "Is he all right?" When Eddie nodded, Prince and Eddie were allowed into the apartment. Eddie led the others into a small room off the kitchen, estimated as 20 by 20 feet in dimension, containing a bed and

dresser. Once inside, defendant asked Prince, "[W]hat you need?", to which the officer replied, "[L]et me get one gram of coke for 50." Defendant said, "[O]kay". J.D. Eddie then reached into a dresser drawer and withdrew a clear plastic bag containing a white rock substance. Using a playing card, Eddie scooped a portion of the white substance out of the bag and placed it on a scale. Eddie weighed the substance, wrapped it in tinfoil and handed it to Prince, who took out $50 and, after displaying some concern as to whom he should pay, handed it to Eddie. Defendant said, "[I]ts all right. We are all family. I am Chief, and that's Eddie."

During the entire transaction, which took three minutes, defendant stood one foot from Prince, who spent the time watching J.D. Eddie weighing and packaging the drugs and "glancing" at defendant, watching Prince from his position by the doorway. Although Prince did not see anyone else, he heard others talking from somewhere within the apartment. Prince was then escorted out of the apartment.

Prince immediately returned to his car and radioed his back-up team that he had made a buy. He did not relay any description of defendant or Eddie at that time. About three hours later, after vouchering the narcotics, Prince filled out a buy report, describing defendant, whom he referred to as J.D. Chief, as a "black male, dark complexion, approximately six feet, approximately 40 years, mustache, salt and pepper large afro, approximately 150 pounds, wearing a T-shirt and blue jeans." On the basis of this buy, the police obtained a warrant to search the West 164th Street apartment. The application contained the description of J.D. Chief which Prince had included in his buy report.

One week later, on April 2, 1987, at about 6:25 P.M., Prince returned to 505 West 164th Street, again encountering J.D. Eddie in front of the building. Eddie took Prince to the same apartment. Defendant answered the knock on the door. Defendant and Eddie led Prince into the same back room off the kitchen. Once inside, defendant asked Prince, "[W]hat you want?" Prince requested one gram of coke for $50. Defendant said, "[O]kay". Eddie withdrew a plastic bag containing a white powder from the dresser drawer and weighed a portion of it. Defendant then picked up a piece of tinfoil from the top of the dresser, wrapped the white substance on the scale in it and handed the package to Prince, who handed him $50. At the time, Prince and defendant were face-to-face. Defendant then led Prince out of the apartment. The entire episode

spanned three minutes; the narcotics transaction was consummated in approximately 1½ to 2 minutes. As in the earlier transaction one week before, Prince heard other voices within the apartment but did not see anyone. Prince described defendant on this second occasion as a dark-complected black man about 6-feet tall, in his 40's, with a salt and pepper afro, wearing a red warm-up top with a white stripe down the sleeves. Prince could not recall whether defendant had a beard on April 2nd.

After leaving the apartment, Prince returned to his car and radioed his back-up team, who were assigned to execute a search warrant at the 505 West 164th Street apartment and were awaiting the go-ahead from him. Prince told them the "buy had gone down" and that the principals were the same two men as the week before. He described defendant and Eddie and the location where he had seen the drugs. Within 4 or 5 minutes of receiving this radio transmission, the back-up team arrived at the apartment, announced their presence, rammed down the apartment door and entered. Defendant, wearing a red sweatshirt, was arrested in the kitchen. Also arrested were Betty Johnson, a resident of the apartment, found seated in a chair, holding a child, between the kitchen and bedroom, and three other occupants, one man and two women, found in the living room. The man, Edward Johnson, was a black man, approximately 5-feet 7-inches tall, 150 pounds and about 30 years of age. He was clean-shaven, had black hair of normal length and wore a light shade sweatshirt; defendant, it should be noted, was older and taller.

During the four-hour search of the apartment which followed, six persons who came to the apartment to purchase drugs were arrested and charged with criminal trespass. Aside from the apartment door, a window and fire escape were the only means of exit from the apartment. The officers recovered three plastic bags containing a white substance, later determined to be cocaine, from the top drawer of the dresser in the small room off the kitchen. This was the same drawer from which Prince saw defendant and J.D. Eddie remove the drugs they had sold him on both occasions.

In the interim, defendant and the other occupants of apartment 2C were taken to the 26th precinct. In defendant's arrest report, based on information he provided, he was listed as 38 years of age, 5-feet 11-inches tall and 180 pounds. Since it was "common procedure," Prince was notified to report to the station house to view the suspects arrested at the apart-

ment. At about 11:10 P.M., Prince, who did not see defendant at the station house before viewing him as part of the identification procedure, identified him as the seller to whom he referred as J.D. Chief. The four other persons—three women and one man, Edward Johnson—were also viewed by Prince in the same lineup procedure.

Afterwards, between 11:20 and 11:50 P.M., Prince filled out a buy report for the transaction earlier that evening in apartment 2C. He estimated defendant's weight at 150 pounds and described his clothing as a red warm-up suit with white stripes. A photograph of defendant taken at the time of his April 2nd arrest shows him with a beard and wearing a red warm-up shirt with blue stripes. As Prince testified, his buy-report descriptions of defendant did not necessarily reflect "every detail" of his appearance; rather, they contain "things that would make [him] recall the person as well as what took place." At trial, Prince identified defendant as the man referred to as J.D. Chief, from whom he twice purchased cocaine inside apartment 2C, although he appeared a "little bit heavier" at trial. He also testified to his station-house identification of defendant on the night of the arrest.

At the *Wade* hearing, Prince testified that defendant and his unapprehended accomplice, J.D. Eddie, sold him cocaine on March 26 and April 2, 1987 inside the apartment in question. He described the face-to-face encounters with defendant, which, on each occasion, lasted at least three minutes. Approximately 4½ hours after the second buy, he was asked to make a station-house viewing of those arrested inside the apartment for the purpose of identification. Prince recalled viewing defendant and at least three others, whose physical characteristics he could not remember. Neither defendant nor any of the individuals with him were handcuffed during the identification procedure. Officer Prince testified that he immediately identified defendant as the seller referred to as J.D. Chief.

The hearing court ruled that the circumstances of the identification were such as to make it one of "inherent reliability". The court took into account the fact that the identification was based on two encounters with the same person on two different occasions, the undercover officer's "training and background" and the "relatively minimal passage of time" between the second of the two transactions and the identification. Accordingly, the motion to suppress the station-house identification of defendant was denied.

██ ██ In arguing that the court erred in admitting at trial evidence of Prince's station-house identification of him, defendant claims specifically that the People, by not adducing evidence of the physical characteristics of the four others who stood beside him at the identification procedure, failed to meet their initial burden of going forward at the *Wade* hearing. Defendant also argues that the reliability of the identification was deficient, citing Officer Prince's failure to mention his beard in describing him, both contemporaneously and, after, in his buy reports, and the disparity between his described and actual weight. Since neither of these points has merit and none of the other claims raised by defendant warrant reversal, the conviction should be affirmed.

While the People have the burden of going forward at a *Wade* hearing with evidence sufficient to demonstrate the constitutional propriety of a police-arranged identification procedure *(see, People v James,* 111 AD2d 254, *affd* 67 NY2d 662), where the identification is made by a trained undercover officer who observed the person making the sale during a face-to-face transaction, knowing that person would be arrested shortly, a station-house observation of such person by the undercover officer hours later would not be "of a kind ordinarily burdened or compromised by forbidden suggestiveness, warranting a lineup procedure or *Wade* hearing." *(People v Wharton,* 74 NY2d 921, 922.)

Here, the *Wade* hearing testimony established, and it is not disputed, that defendant was viewed by a trained undercover officer, who observed him, in a one-week span of time, during two face-to-face drug transactions. Nor is it disputed that Officer Prince, at the time of the second encounter, knew that defendant would shortly be arrested by his back-up team. As the People argued in their papers opposing defendant's motion for a *Wade* hearing and as the court, in its oral decision noted, although neither specifically used the word "confirmatory" to characterize the identification procedure at issue, these circumstances establish that the station-house identification procedure was confirmatory and not of the kind "warranting a lineup procedure or *Wade* hearing." *(Supra,* 74 NY2d, at 922.) Thus, while the race, gender, ethnicity of those who were arrested with defendant and stood beside him at the station house when he was identified would have been relevant had this been a nonconfirmatory identification procedure, they are irrelevant in this case.

Even defense counsel, in characterizing the identification as a "confirmatory check" and a "confirmatory identification" in his cross-examination of Prince, recognized what was at issue at the *Wade* hearing, i.e., whether the station-house procedure was a proper confirmatory identification. Since the People presented undisputed proof at the hearing that the identification was confirmatory, rendering any inquiry into the physical makeup of the participants in that proceeding irrelevant, they met their burden of going forward and the hearing court properly denied defendant's motion to suppress the identification.

Nor, as is suggested by the dissent, is a drive-by identification of a suspect in custody a necessary precondition to the validity of a subsequent station-house confirmatory identification. While the undercover officer made a drive-by confirmation in *Wharton (supra),* this fact was in no way dispositive in the court's determination. In fact, as *Wharton* explicitly holds, what is dispositive is that the undercover officer observed the defendant, as here, during the "face-to-face drug transaction" knowing that he would "shortly be arrested" *(supra,* 74 NY2d, at 922), not that he saw the defendant arrested. Moreover, as the case law makes clear, station-house confirmatory identifications made hours after the undercover buy are proper, irrespective of whether there has been an on-the-scene identification. *(See, e.g., People v Soto,* 167 AD2d 302.)

■ Despite the evidence showing that defendant was arrested less than five minutes after the April 2, 1989 sale inside the apartment where that sale took place and that defendant was, at arrest, a dark-complected black man, close to 40 years old, approximately 6-feet tall, with a salt and pepper afro and wearing a red sweatshirt, as described by the undercover officer, the dissent rejects the reliability of Officer Prince's identification of him, citing the officer's failure to note, as part of that description, defendant's beard and the discrepancy between his listed and actual weight. This argument, as well as others of a similar nature, was, of course, presented to the jury and, not surprisingly, rejected. That Prince did not mention defendant's beard in his necessarily brief descriptions of J.D. Chief does not, as is suggested, mean that the man referred to as J.D. Chief was beardless. Such omission indicates no more than that Prince did not focus on facial hair as a characteristic of which he took specific note. Indeed, he identified defendant, who had a beard, as J.D. Chief at the station house and almost immediately filled out his

April 2nd buy report without mentioning the beard. Had Prince viewed the beard as a required descriptive feature of J.D. Chief, he would surely have included it in his description. The weight discrepancy relates to a subjective evaluation as to which reasonable minds might differ and does not undermine the strength of the evidence proving defendant's identity as J.D. Chief. On this record, it is clear that defendant's identity as J.D. Chief was firmly established by proof beyond a reasonable doubt.

We have examined defendant's other claims and find that they are without merit.

Accordingly, the judgment of the Supreme Court, New York County (Jeffrey Atlas, J., at *Wade* hearing; Felice Shea, J., at trial and sentence), rendered August 29, 1988, convicting defendant of two counts each of criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree and sentencing him to four concurrent indeterminate terms of imprisonment of from 5½ to 11 years, should be affirmed.

MURPHY, P. J. (dissenting). The defendant has been convicted after a jury trial of two counts of criminal sale of a controlled substance in the third degree and two counts of criminal possession of a controlled substance in the third degree, and sentenced to a concurrent term of 5½ to 11 years on each count. The principal evidence implicating him in the commission of these crimes was the testimony of undercover Officer Louis Prince. Prince testified at trial that he had purchased cocaine from the defendant on two occasions. The theory of the defense was that Prince had misidentified the defendant.

Central to this appeal is the defendant's contention that Prince's identification of the defendant at a station-house viewing some five hours after the defendant's arrest ought to have been suppressed because the People did not meet their burden of going forward at the pretrial *Wade* hearing held to determine whether the station-house identification was sufficiently reliable to be admitted at trial.

The single witness at the *Wade* hearing was Officer Prince. Prince testified that he had made two purchases of narcotics from a person whom he referred to as J.D. Chief and another person who was never apprehended. The first of these purchases took place on March 26, 1987 at an apartment located at 505 West 164th Street in Manhattan. Apart from the fact

that the transaction was brief, lasting about three minutes, there were no other details provided at the hearing illuminating the circumstances under which it was conducted. The second purchase took place on April 2, 1987 at the same apartment. Again, the purchase took only three minutes. During this time Prince noted that there were numerous people in the apartment. The person whom he referred to as J.D. Chief was the only black man he saw, but Prince acknowledged that he did not look in all of the apartment's rooms. Shortly after the April 2, 1987 purchase, a warrant authorizing the search of the apartment was executed and those present in the apartment were arrested. No identification procedure was conducted immediately after the arrest. Rather, several hours later Prince was asked to come to the precinct to make an identification "because", he was told, "they have some subjects from the warrant location". Prince accordingly went to the precinct and some five hours after the drug purchase viewed a lineup through a one-way mirror. Of the people in the lineup Prince could recognize only the defendant whom he identified as J.D. Chief. Prince could remember nothing about those whom he had viewed along with the defendant, nor was there any photographic record introduced documenting the composition of the lineup.

In reports completed by Prince after the March 26 transaction and after the identification procedure conducted on April 2, Prince described J.D. Chief as a black man about 40 years old and 6-feet tall weighing approximately 150 pounds. Prince noted that J.D. Chief had a salt and pepper afro and that he had a mustache but made no mention of any other facial hair. Defendant's arrest photograph, however, disclosed that he had a full beard and it was stipulated that at the time of his arrest he weighed 180 pounds.

In denying the motion to suppress the station-house identification, the motion court began by observing "[T]here is nothing on the face of it which suggests—which teaches me or which evidences any deliberate or even negligently suggestive procedure on the part of the police department." The court then noted that Officer Prince was trained in making identifications and concluded that under all the circumstances his identification possessed "inherent reliability" and should not be suppressed.

It is clear that at a pretrial *Wade* hearing it is the People's burden to come forward with evidence showing that the identification procedures used by the police were not violative

of the defendant's constitutional rights *(see, People v James,* 111 AD2d 254, *affd on other grounds* 67 NY2d 662; *People v James,* 110 AD2d 1037; *People v De Congilio,* 71 AD2d 990; *People v Borges,* 37 AD2d 581). This entails, at a minimum, a showing that the identifying witness initially observed the defendant under conditions which permitted the witness to commit the defendant's appearance to memory and a further showing that the identification procedures subsequently employed were free from suggestive influences potentially leading to misidentification.

The People do not argue that they met this burden. Indeed, the argument would be tremendously difficult to make, for manifestly there was nothing in the record to support the motion court's finding that the April 2 identification procedure had not been suggestive. Due to the People's deficient presentation, the court knew nothing about the composition of the lineup in which the defendant had appeared and, therefore, was not in a position to draw any conclusion as to whether the lineup had been fair. The danger of effectively relieving the People of their burden was, of course, fully realized at trial when, with the station-house identification already before the jury, it was revealed that the lineup viewed by Prince had been composed entirely of those arrested at the 505 West 164th Street apartment and that not one of those persons resembled the defendant, even remotely; flanking the defendant in the lineup were a black woman, two hispanic women, and a black man who the People concede did not look like the defendant and who was, in any case, young enough to have been the defendant's son.

As noted, it is not the People's position that they carried the burden which would ordinarily be theirs at a *Wade* hearing, or even that they could have, for the lineup was by any standard patently suggestive. Rather, it is the People's position that they had no burden at all because under the circumstances there was none but a negligible possibility that their witness would be influenced by even the most suggestive identification procedures. In this regard they stress that their witness was a trained undercover officer, that he had had two encounters with the defendant in the week preceding the defendant's arrest, and that the second of these encounters occurred at "a relatively minimal" interval from the station-house identification and at a time when the officer had reason to believe that the defendant would shortly be arrested. In furtherance of this argument, that their witness was immune

to suggestive influence and that his identification should, therefore, be exempt from the sort of scrutiny required at a *Wade* hearing in satisfaction of the due process guarantees of the Constitution, the People cite to the Court of Appeals memorandum in *People v Wharton* (74 NY2d 921) which they find dispositive.

In *Wharton (supra)* a police officer participating in what is called by law enforcement authorities a "buy and bust" operation, purchased cocaine from the defendant therein. Just after the purchase, the officer radioed a description of the defendant to his back-up team and the back-up team immediately proceeded to the cite of the transaction and arrested defendant. Within five minutes of the arrest the purchasing officer drove by the arrest site and identified the defendant as the person from whom he had purchased the cocaine. Some three hours later, the purchasing officer again identified the defendant, this time through a one-way mirror at the station house. The defendant's motion for a *Wade* hearing was denied upon the ground that the station-house viewing was merely confirmatory. The propriety of that denial was subsequently upheld by the Appellate Division and by the Court of Appeals which stated in its affirming memorandum: "It is not disputed that the identification was made by a trained undercover officer who observed defendant during the face-to-face drug transaction knowing defendant would shortly be arrested. Thus, there is evidence in the record to support the determination of the courts below that the officer's observation of defendant at the station house approximately three hours later was not of a kind ordinarily burdened or compromised by forbidden suggestiveness, warranting a lineup procedure or *Wade* hearing" *(supra,* at 922). The court in concluding, however, went out of its way to stress that this holding was not to be taken as a broad permission to dispense with *Wade* hearings, and to indicate that its affirmance of the Appellate Division's order was dictated largely by its observance of its jurisdictional limitations: "In sum, we imply no categorical rule exempting from requested *Wade* hearings confirmatory identifications by police officers by merely labeling them as such *(see, People v Perez,* 74 NY2d 637). Where the nature and circumstances of the encounter and identification may warrant, a hearing should and undoubtedly will be held. However, there is no basis in this record for us to conclude that the trial court, as affirmed by the Appellate Division, erred as a matter of law in denying the suppression hearing and motion" *(supra,* at 923).

In the more recently decided case of *People v Newball* (76 NY2d 587) the Court of Appeals has reiterated that *Wharton* was not intended to create for police identifications a broad and ready exemption from scrutiny at pretrial *Wade* hearings *(People v Newball, supra,* at 592; *see also, People v Gordon,* 76 NY2d 595, 600-601). Rather, as the analysis in *Newball* demonstrates, each case must be carefully evaluated on its own facts.

The issue in *Newball (supra)* was whether the People were to be excused from giving notice, pursuant to the requirement of CPL 710.30, of their intention to introduce identification testimony at trial. In support of the dispensation sought, the People argued, as they do in this case, that because the identification of their police witness was merely confirmatory, it was not of a kind " 'ordinarily burdened or compromised by forbidden suggestiveness' *(People v Wharton,* 74 NY2d, at 922, *supra)" (People v Newball, supra,* at 592). Thus, they argued that the mandated notice which would ordinarily trigger a defendant's request for a *Wade* hearing where identity was at issue, was unnecessary because their police witness's identification was so inherently reliable as to render pretrial scrutiny of the circumstances under which it was obtained, superfluous.

In rejecting this argument, the *Newball* court, citing *People v Gissendanner* (48 NY2d 543) noted that the only acceptable bases for dispensing with procedures mandated to assure the reliability of identifications to be used at trial, were that "the defendant's identity [was] not in issue, or * * * the protagonists [were] known to one another" *(People v Gissendanner, supra,* at 552, cited in *People v Newball, supra,* at 591). And, in assessing whether the protagonists were in fact "known to one another", the court found the following passage from *People v Collins* (60 NY2d 214) to be of particular relevance: "[Knowledge], of course, is necessarily a question of degree. When a crime has been committed by a family member, former friend or long-time acquaintance of a witness there is little or no risk [of taint through police suggestion]. * * * But in cases where the prior relationship is fleeting or distant it would be unrealistic to ignore the possibility that police suggestion may improperly influence the witness in making an identification" *(supra,* at 219, cited in *People v Newball, supra,* at 591).

As this is a case in which identity is most assuredly at issue, the predicate for the People's claim that they were not re-

quired to go forward at defendant's *Wade* hearing to establish that Officer Prince's station-house identification of the defendant was not prompted by police suggestion, must be that Prince and the defendant were known to one another. Reduced to its essentials then the People's central contention on this appeal is that two three-minute encounters with the J.D. Chief, the last of which occurred some five hours prior to the Prince's purported identification of him, were sufficient to make J.D. Chief so well known to Prince that there was "little or no risk of taint through police suggestion." This is simply not tenable.

In *People v Wharton (supra)* it will be recalled, the interval between the arrest and the drive-by identification by the undercover officer was a mere five minutes. The police having, by this procedure, already substantially eliminated the possibility that the wrong person had been taken into custody, cannot be said to have courted any but the most minimal risk of misidentification when, 3½ hours later the defendant was identified a second time by the undercover officer at the station-house showup. Here, by contrast, the first identification of the defendant occurred nearly five hours after Prince's three-minute encounter with J.D. Chief. The notion that Prince's memory of J.D. Chief must at the juncture have been accurate, much less indelibly so, is not supportable.

To begin, it is unarguable that Prince's acquaintance with J.D. Chief did not even approach the level of familiarity that would ordinarily constitute a prima facie basis for dispensing with pretrial safeguards against mistaken identification testimony; Prince was not a member of J.D. Chief's family, nor was he a former friend or long-time acquaintance *(see, People v Collins, supra,* at 219; *People v Newball, supra,* at 591). Indeed, Prince's contact with J.D. Chief cannot be characterized as anything but fleeting. The People do not deny this but maintain nevertheless that they demonstrated at the *Wade* hearing that Prince's station-house identification was merely confirmatory. In this connection they place the heaviest reliance on Prince's training and the fact that he knew at the time of the April 2 transaction that J.D. Chief would likely be arrested in short order *(see, People v Wharton, supra).*

Although it may seem reasonable to believe that undercover narcotics agents are, in light of their training, possessed of superior powers of observation and identification, there is little in the way of objective evidence to justify this belief. Studies, in fact, have shown that as a general matter the

identifications of police witnesses are no more reliable than those of laypersons *(see, e.g.,* Tickner & Poulton, *Watching for People and Actions,* 18 Ergonomics 35 [1975])* and may even be less so *(see, e.g.,* Krouse, *Effects of Pose, Pose Change and Delay on Face Recognition,* 66 J of App Psychology 651). In his dissent in *People v Wharton,* Judge Titone ably noted some of the reasons why police identifications ought not to be too readily relied upon:

"As cases such as *People v Chillis* [60 AD2d 968], *People v Baez* [103 AD2d 746], and *People v Williams* [79 AD2d 929] reflect, even trained police officers who have observed the suspect with professional detachment are subject to suggestive influences. Indeed, although the risk of misidentification may be diminished in cases involving police witnesses because of their expertise and relative detachment, there are special problems associated with station house police identifications following street 'buy and bust' operations that raise reliability questions not present in ordinary pretrial identification procedures. As is evident from the trial record in this case, 'buy and bust' teams ordinarily have many encounters and make many 'buys' during the course of their shifts before they return to the station house to 'confirm' the arrests made by their backup teams. Accordingly, they must retain in their memories the details of many intervening faces and events, all of which relate to essentially similar transactions. Furthermore, the undercover's contact with the drug seller often is fleeting and takes place under circumstances that are not conducive to careful observation because of the officer's wish to avoid arousing suspicion. Finally, although I do not suggest that a police officer would knowingly identify the 'wrong' person, it cannot be denied that there is a certain degree of suggestion inherent in the very fact that the officer's own backup team, consisting of individuals with whom he may work on a regular basis, has made an arrest on the basis of the officer's description.

"For all of these reasons, I do not believe that the expertise and detachment that ordinarily accompanies identifications by police officers obviates the need to test such identifications for suggestive influences that might impair their accuracy. Accuracy of the postarrest station house identification is particularly critical in cases such as this, since, unlike the ordinary citizen witness who typically have few encounters with crime, a police officer may have contact with hundreds of suspects in the time between the arrest and the trial. Accordingly, the

police officer's in-court identification testimony, if any, is likely to be discounted, and, concomitantly, his testimony describing the station house identification that took place shortly after the arrest is likely to take on great probative significance." *(People v Wharton, supra,* at 929-930 [Titone J., dissenting]; *see also, People v Gordon, supra,* at 601.)

In the end, police training is but a factor to be considered in evaluating the reliability of an officer's identification, it is not a guarantee of reliability, nor should an officer's professional qualifications be relied upon to the point that a court's inquiry into the circumstances of a particular identification is relaxed or, as here, practically abandoned.

Looking beyond the guarantee of reliability which the People falsely posit in Officer Prince's training, it becomes apparent that Prince's recollection of the defendant may well have been flawed and, at the very least, was not so certain as to have been impervious to suggestion. Given the People's sparse presentation at the *Wade* hearing, which did not disclose in any detail the circumstances under which Prince's observations of J.D. Chief were made, there was little basis to conclude that Prince had had the opportunity to form an accurate impression of J.D. Chief's appearance. Assuming, however, that Prince had accurately described J.D. Chief in his buy reports, there were significant discrepancies between his description of J.D. Chief and the defendant. As noted, Prince made no mention in his reports concerning J.D. Chief of the full beard that was perhaps the defendant's most prominent feature. And, in describing J.D. Chief as being 6-feet tall and weighing a mere 150 pounds he portrayed a man of slight build in distinction to the defendant who at the same height and weighing an additional 30 pounds would have possessed a notably heavier build. Thus, even if there were a basis to suppose that Prince had obtained a reliable impression of J.D. Chief, the question would still remain as to whether that impression retained its freshness and reliability some five hours after the protagonists' encounter when Prince viewed the station-house lineup. It is not particularly helpful in answering this question that Prince had reason to believe at the time of the April 2 transaction that J.D. Chief might soon be arrested. Whatever Prince may have thought as to the imminence of the arrest, the fact remains that his identification was made considerably after the arrest when his memory of J.D. Chief may well have faded and become susceptible to suggestive influence.

Under these circumstances there was no basis to relieve the People of the burden, ordinarily theirs at a *Wade* hearing, to demonstrate that the identification procedures employed by the police were not suggestive. As the People failed to meet this burden, Officer Prince's station-house identification of the defendant ought to have been suppressed.

Finally, there can be no claim, and indeed none is made, that the admission of Officer Prince's station-house identification at the defendant's trial was harmless. Prince's identification testimony was the sole evidence implicating the defendant in the commission of the offenses for which he was convicted. Had Prince's in-court identification been deprived of the bolstering effect of the much earlier and presumptively more probative lineup identification there might well have been a different result in this case *(see, People v Dodt,* 61 NY2d 408; *see also, People v Wharton, supra,* at 930 [Titone J., dissenting]).

Accordingly, the judgment of the Supreme Court, New York County (Jeffrey Atlas, J., at suppression hearing; Felice Shea, J., at jury trial and sentence), rendered August 29, 1988, convicting defendant after a jury trial of two counts of criminal sale of a controlled substance in the third degree, and two counts of criminal possession of a controlled substance in the third degree, and sentencing him to concurrent indeterminate terms of from 5½ to 11 years should be reversed and the matter remanded for a new trial, in connection with which the lineup identification of the defendant should be suppressed and a new *Wade* hearing held for the limited purpose of affording the People an opportunity to demonstrate that there was an independent source for Officer Prince's in-court identification of the defendant.

ROSENBERGER, ROSS and ASCH, JJ., concur with SULLIVAN, J.; MURPHY, P. J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered August 29, 1988, affirmed.