*333 OPINION OF THE COURT
David Goldstein, J.
The defendant is charged, inter alla, with criminal sale of a controlled substance in the third degree, criminal possession of a weapon in the third degree and robbery in the third degree. Among the issues presented to this court during the combined Wade/Mapp hearing were defendant’s standing to challenge the search warrant and the propriety of a postarrest station house identification by the undercover police officer.
Former counsel, in addition to moving to suppress the identification, has also moved to suppress physical evidence, but failed to specifically request controversion of the search warrant. This court permitted substitute counsel to seek relief, albeit late, and directed a hearing.
Facts
The People called five witnesses, Detective Scott Massoni, assigned to the Brooklyn Special Victims Squad, Detective Michael Rocco, assigned to the 94th Precinct Detective Squad, Detective Michael Oliver, assigned to the Queens Narcotics Division, and Parole Officers Nathan Uretsky and Stephen Marcus. Defendant testified in his own behalf and called Elouise Richardson and Otis Cook. As will be more fully explained later, after both parties had rested, but prior to the rendering of a decision, it was discovered that Detective Rocco had aided in defendant’s booking procedure by fingerprinting him. Upon defendant’s application, the court reopened the hearing to receive testimony concerning this additional viewing of defendant by Rocco and what influence, if any, it had on his in-court identification.
The court finds the testimony of the People’s witnesses credible and not marred by any serious inconsistencies. The court further finds that on November 1, 1990, while acting as an undercover police officer, Detective Rocco was introduced to defendant in apartment 6B, at 41-13 10th Street, by a female, later identified as Vanessa Price. He observed defendant, who was introduced to him as "B,” for four to five minutes, during which time defendant removed his jacket, revealing a .38 caliber gun in his waistband.
Rocco again met defendant on November 5, 1990, initially, in apartment 6B, and then in the rear of the project, at 41-14 10th Street, where defendant agreed to sell Rocco 1/8 of an *334 ounce of cocaine. He requested the money first but, when Rocco refused, defendant became angry, went into the building and, when he returned, he threw a packet, containing cocaine, at Rocco. When Rocco took $20 from his wallet, defendant attempted to grab the entire wallet, taking $60 in currency and telling Rocco to leave or he would be "a dead man.” This incident lasted approximately 15 minutes.
On November 9, 1990, Detective Oliver spoke to Rocco about the events of November 1 and 5, 1990 and, with the assistance of the Queens District Attorney’s office, Oliver prepared an affidavit and obtained a no-knock search warrant.
On November 13, 1990, at approximately 6:30 a.m., Detective Massoni, assigned at that time to the Queens Narcotics District, executed the warrant. Inside apartment 6B, he observed defendant and Vanessa Price, in bed, with a child. In two rear bedrooms were two other children. After a search of the apartment uncovered two guns from on top of a kitchen cabinet, defendant and Price were transported to the 114th Precinct.
At the station house, Rocco was brought to a door with a peephole and, after looking through, identified defendant, who was standing alone with Detective Massoni. Afterwards, inasmuch as Rocco’s role as an undercover ended with the identification, Rocco assisted in the arrest procedure. Several hours after the showup, Rocco removed defendant from his cell and spent approximately 10 minutes fingerprinting him.
Standing to Controvert the Warrant
The court finds that defendant does have standing to challenge the search warrant. Undisputed on this record is that, at the time the warrant was executed, defendant was, at least, an overnight guest and, at most, a full-time resident of the apartment. According to the search warrant application, "B,” identified as defendant, told Rocco that he ("B”) lived in the apartment and that Rocco "could come back anytime.” The police reports, while not in evidence, are part of the court file, and reflect defendant’s residence as the apartment in question. Finally, the underlying circumstances of the arrest, wherein defendant was found in the apartment, in bed, at 6:30 in the morning, would lead any reasonable person to conclude that he was, if not a permanent or semipermanent resident, at least an overnight guest.
Having established defendant’s status in the apartment, it is *335 clear that, under these circumstances, he had a legitimate expectation of privacy, thus conferring upon him requisite standing to challenge the warrant. "To hold that an overnight guest has a legitimate expectation of privacy in his host’s home merely recognizes the everyday expectations of privacy that we all share * * * [W]e think that society recognizes that a houseguest has a legitimate expectation of privacy in his host’s home.” (Minnesota v Olson, 495 US 91, 98.) Accordingly, defendant has standing to challenge the warrant.
The District Attorney has advanced two additional arguments in an attempt to prevent defendant from challenging the warrant. First, he claims that, since Minnesota v Olson (supra) dealt with a warrantless entry and did not concern the execution of a search warrant, it is, therefore, inapplicable to the case at bar. In Jones v United States (362 US 257), the Supreme Court of the United States held that a guest in an apartment had standing to raise the question of the legality of a search conducted pursuant to a search warrant. Although the court later narrowed the standing qualifications in Rakas v Illinois (439 US 128) the Rakas court reaffirmed the factual holding in Jones that defendant in that case had suffered a violation of his personal, Fourth Amendment rights if the search was found to be unlawful. Accordingly, the fact that this defendant has moved to controvert execution of a warrant, rather than challenge a warrantless entry, is without dispositive effect.
The second argument advanced by the People is that the critical date, in terms of standing, is the date of issuance of the warrant, not its execution. Thus, the People contend that, inasmuch as defendant cannot demonstrate requisite standing on the day the warrant was issued, he may not challenge the underlying showing of probable cause for the issuance of the warrant, notwithstanding that he may have had standing on the date of its execution.
This argument, albeit novel, is without merit. If the operative standard is the expectation of privacy when the warrant is issued, not its execution, then all reported decisions on the issue of standing would be irrelevant, including Minnesota v Olson and Jones v United States (supra), since the result would be that only those visitors or guests who could establish standing on the date of the issuance of the warrant would be able to challenge it. Under the rationale offered by the People, those whose rights had been violated by the entry of law enforcement officers into private homes, where such persons *336 had been staying, would be without available remedy. Under the People’s analysis, the Fourth Amendment’s protection against unreasonable searches and seizures would be rendered meaningless if a defendant, with requisite standing at the time of the search, could be precluded from litigating the reasonableness of police conduct because he had no privacy interest in the premises searched at the time the warrant was issued. For these reasons, plainly, the District Attorney’s argument must be rejected.
Probable Cause for Issuance of Warrant
Turning to the application and warrant itself, the court finds sufficient probable cause existed for its issuance. The undercover officer provided firsthand information, describing a gun and drug paraphernalia, which he had observed in apartment 6B and drug-related conversations which he had with both defendant and Vanessa in that apartment. The two-pronged test, as required by Aguilar v Texas (378 US 108) and Spinelli v United States (393 US 410) was, therefore, established in that the informant was an undercover police officer and his information was based upon his own observations. The fact that the words "Apt. 6B” are missing from the body of the affidavit submitted on the application until the very end, in paragraph 3, does not alter its validity. It is obvious that these words were inadvertently omitted from paragraph 2 (A) of the affidavit, which reads as follows: "I am currently assigned to an investigation of alleged cocaine traffic at 41-13 10th Street, County of Queens, New York, more particularly, 41-13 10th Street, County of Queens, New York (hereinafter the 'subject location’).” As typed, this paragraph makes no sense at all, since the second address set forth is exactly the same as the first, with no further specificity or particularity. It is plain that the words "Apt. 6B” were to have been added to the second time the address appears in order for this paragraph to have any real or practical meaning.
This, in my view, is the only rational construction to accord to paragraph 2 (A) of the affidavit. Clearly, the apartment number to be searched, which appears later in the affidavit, was inadvertently omitted. Contrary to defendant’s argument, the technical omission is not dispositive, especially since the intent and meaning of the affidavit as a whole is apparent. Any other holding here would be inconsistent with the long line of reported decisions holding that warrants and applica *337 tians for a warrant "should not be construed in a hypertechnical manner” (People v Williams, 119 AD2d 606, 607) but rather, by "a common-sense reading of the entire application” (see, People v Sinatra, 102 AD2d 189, 191). As was observed by Judge (now Chief Judge) Wachtler, writing for a unanimous Court of Appeals in People v Hanlon (36 NY2d 549, 559): "When considering whether probable cause exists no infallible formula is available; ideally we consider the probabilities as perceived by a reasonable, cautious and prudent police officer and evaluated by an independent Magistrate. However, in the real world, we are confronted with search warrant applications which are generally not composed by lawyers in the quiet of a law library but rather by law enforcement officers who are acting under stress and often within the context of a volatile situation. Consequently such search warrant applications should not be read in a hypertechnical manner as if they were entries in an essay contest. On the contrary, they must be considered in the clear light of everyday experience and accorded all reasonable inferences. (See, e.g., United States v Ventresca, supra [380 US 102]; Brinegar v United States 338 US 160, 175.)”
Applying this realistic, commonsense approach in terms of the appropriate interpretation of the application for the search warrant in this case, I find the supporting papers sufficiently particular in setting forth the premises to be searched. Accordingly, that branch of the motion to controvert the search warrant and to suppress physical evidence which was seized is denied in all respects.
Identification — Wade Hearing
With respect to the Wade issue, while identifications by undercover officers are usually not subject to review by the hearing court, since they are merely confirmatory in nature (see, People v Morales, 37 NY2d 262; People v Hill, 147 AD2d 500), it is clear that the identification in this case did not occur "at a place and time sufficiently connected and contemporaneous to the arrest itself as to constitute the ordinary and proper completion of an integral police procedure.” (People v Wharton, 74 NY2d 921, 922-923.) As a result, the court must examine the underlying circumstances of the identification procedure in order to ascertain whether the encounter and identification were violative of defendant’s constitutional rights.
*338 In my view, the facts and disposition in this case fall within the purview of People v Gordon (76 NY2d 595). In Gordon, there was a 10-day lapse between the date of the sale and the date of the station house showup. In our case, there was an eight-day lapse. As in Gordon, a highly suggestive showup took place at the precinct, albeit, unlike Gordon, defendant here was not handcuffed. The Court of Appeals observation in Gordon (supra, at 600), however, is instructive here: "[T]he fact that the identifying witness in this case is a trained undercover police officer who made the prior drug purchase with defendant’s participation cannot, by itself, overcome the extreme features of suggestiveness present in this case. Thus, the subsequent showup does not qualify for exceptional treatment under People v Morales (37 NY2d 262) or People v Wharton (74 NY2d 921, supra). ”
In both Morales and Wharton (supra) station house showups by trained, experienced undercover police officers were held not to be unduly suggestive under the special facts in those cases. In Morales, the showup was held six hours after the buy-and-bust and the suspect had been identified by the undercover, on the street, immediately after the buy. Thus, the station house identification was to confirm that the right .person had been arrested and, under the circumstances, was found not to be unduly suggestive. In Wharton, a request for a Wade hearing was denied where the showup was held three hours after the arrest and the undercover viewed the defendant on the street, during the time he was being placed under arrest. Under those unique circumstances, the showup was found to be sufficiently connected to the arrest "as to constitute the ordinary and proper completion of an integral police procedure.” (74 NY2d, at 922-923.)
In the present case, the People have not demonstrated the existence of any exigent circumstances which would sustain as confirmatory the station house identification. Here, as in Gordon, there was an extensive time delay between the buy and the arrest; the showup was highly suggestive; and, clearly, it was not "an integral police procedure.” Inasmuch as there were no exigent circumstances here and it would not have been unduly burdensome to have conducted a lineup, the station house showup must be suppressed (People v Riley, 70 NY2d 523, 530; People v Anderson, 136 AD2d 712).
Nevertheless, notwithstanding the improper showup, the court finds that there was an independent source for the in- *339 court identification by Detective Rocco. The factors to be considered by the court in determining whether an independent source does exist are the prior opportunities to observe the alleged criminal act, the discrepancies, if any, of descriptions given by the witness, the failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the identification procedure. (See, United States v Wade, 388 US 218.) In the later cases of Neil v Biggers (409 US 188) and Manson v Brathwaite (432 US 98) additional factors were listed by the Supreme Court which would allow an otherwise suggestive identification procedure to be admitted because the identification was reliable. These additional criteria are the witness’ degree of attention during the crime and the level of certainty at the confrontation. Taking all these factors into consideration, this court cannot find that, under a totality of the circumstances, there is "a very substantial likelihood of irreparable misidentification” (Simmons v United States, 390 US 377, 384). Detective Rocco had an opportunity to view defendant for four or five minutes on November 1, 1990, in a well-lighted apartment and, again, for approximately 15 minutes, on November 5, 1990. He was in close proximity to the defendant, in the transactions leading to the sale, talking to him face to face. Under these circumstances, including Rocco’s experience and training as a police officer, plainly, Rocco’s identification is based upon an independent source, rather than the station house showup.
While this court does not condone the People’s failure on the initial hearing to elicit testimony concerning Rocco’s fingerprinting of the defendant, it cannot be said that such procedure had any effect upon Rocco’s in-court identification here since, as previously noted, the two prior encounters between Rocco and defendant were of such duration and under such circumstances so as to render the identification reliable.
Accordingly, upon the foregoing grounds, defendant’s motion to suppress physical evidence and to controvert the search warrant is denied in all respects. That branch of the motion to suppress both the in-court and out-of-court identifications is granted only to the extent that the station house showup is suppressed but, in all other respects, the motion is denied.